UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ANTHONY M. CORRADO**,<br>318 Delaware Avenue<br>Claymont, Delaware 19703,<br><br>Plaintiff,<br><br>v.<br><br>**THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA**,<br>3451 Walnut Street<br>Philadelphia, Pennsylvania 19104,<br><br>and<br><br>**THE FRATERNAL ORDER OF POLICE, LODGE NO. 113 (PENN POLICE ASSOCIATION)**,<br>P.O. Box 30757<br>228 S. 40th Street<br>Philadelphia, Pennsylvania 19104,<br><br>Defendants. | CIVIL ACTION NO. 2:26-cv-7577<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

The plaintiff, ANTHONY M. CORRADO (“Corrado”), by and through his undersigned counsel, brings this Complaint against the defendants, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA ( Penn."), THE FRATERNAL ORDER OF POLICE,LODGE NO. 113 (PENN POLICE ASSOCIATION), ("PPA"), and in support thereof alleges as follows:

## NATURE OF THE ACTION

1. This is an action for breach of a collective bargaining agreement under § 301 of the Labor Management Relations Act, 1947 ("LMRA"), 29 U.S.C. § 185, and for breach of the

correlative duty of fair representation implied under the National Labor Relations Act, 29 U.S.C. § 151 et seq., arising from the wrongful termination of Corrado's employment as a Penn Police Officer during a probationary period that, as alleged herein, should have concluded, at the latest, twelve months after his date of hire under the express terms of the governing collective bargaining agreement.

2. Corrado alleges that Penn unilaterally and repeatedly extended and recalculated his probationary status beyond the maximum period permitted by the Collective Bargaining Agreement between Penn and the PPA , failed to timely conclude an internal investigation as required by the CBA, denied Corrado notice and an opportunity to respond to a disciplinary memorandum before it was used against him, and ultimately terminated his employment without affording him the progressive disciplinary protections to which non-probationary employees are entitled under the CBA — all in breach of the CBA.

3. Corrado further alleges that the PPA breached its duty of fair representation by failing to ensure Corrado received timely notice of material changes to his employment status, by failing to file or meaningfully pursue a grievance on Corrado's behalf regarding his termination, and by failing to advance Corrado's grievances to arbitration — the only mechanism by which Corrado's claims could be finally and conclusively resolved under the CBA.

**PARTIES**

4. Corrado is an adult individual residing at 318 Delaware Avenue, Claymont, Delaware 19703.

5. According to information and belief, Penn is a nonprofit corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located

at 3451 Walnut Street, Philadelphia, Pennsylvania 19104, and operates the University of Pennsylvania Police Department at 4040 Chestnut Street, Philadelphia, Pennsylvania 19104.

6. PPA is an unincorporated labor organization P.O. Box 30757 228 S. 40th Street, Philadelphia, Pennsylvania 19104.

## JURISDICTION & VENUE

7. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 301(a) of the LMRA, 29 U.S.C. § 185(a), because this action arises from an alleged breach of a collective bargaining agreement between an employer and a labor organization representing employees in an industry affecting commerce, and from the PPA 's correlative duty of fair representation implied under the National Labor Relations Act.

8. This Court has supplemental jurisdiction over Corrado's state law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to Corrado's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

9. Specifically, Corrado's state-law claims and federal claims arise from a common nucleus of operative fact concerning Corrado's employment with Penn, , Penn's termination of his employment, and the parties' respective rights and obligations under the collective bargaining agreement. Resolution of these claims will involve overlapping evidence and witnesses concerning Corrado's employment, compensation, termination, and Penn's failure to pay amounts allegedly due.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Penn and PPA both maintain their principal place of business in Philadelphia, Pennslyvania, representational activities are within this District, and a substantial part of the events or omissions giving rise to the claims herein occurred in Philadelphia, Pennsylvania.

## FACTUAL ALLEGATIONS

### The Collective Bargaining Relationship

11. At all relevant times herein, Penn was and is an employer engaged in an industry affecting commerce within the meaning of § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

12. At all relevant times herein, PPA was and is a labor organization within the meaning of § 301 of the LMRA, 29 U.S.C. § 185(a).

13. At all relevant times, PPA served as the exclusive collective-bargaining representative for the bargaining unit that included police officers employed by Penn.

14. Penn recognized PPA as the exclusive representative of bargaining-unit employees concerning wages, hours, discipline, discharge, grievance rights, and other terms and conditions of employment.

15. At all relevant times, Joseph McCauley was an officer, representative, and/or authorized agent of PPA who was and is responsible, in whole or in part, for representing bargaining-unit employees and administering grievances arising under the applicable collective bargaining agreement.

16. At all relevant times herein, by taking or failing to take the actions alleged herein, McCauley acted within the course and scope of McCauley's authority as a representative and agent of PPA .

17. By taking or failing to take the actions alleged herein, McCauley acted within the course and scope of McCauley's authority as a representative and agent of PPA .

18. Unless stated otherwise, at all relevant times herein, Corrado occupied a position within the bargaining unit represented by PPA and was therefore entitled to the rights, benefits,

procedures, and protections provided by the operative collective bargaining agreement between Penn and PPA.

**<u>The Collective Bargaining Agreement</u>**

19. On or around October 4, 2023, Penn and PPA negotiated and entered into a collective bargaining agreement effective August 1, 2023 (the "CBA") for the benefit of employees occupying covered bargaining-unit positions.

20. Annexed hereto as "**Exhibit A**" is a true and correct copy of the CBA and Corrado incorporates the entirety of the CBA as though fully alleged and stated herein.

21. The CBA constituted a binding contract between Penn and PPA within the meaning of § 301 of the LMRA, 29 U.S.C. § 185.

**Employee & Membership Status**

22. An "employee" as referenced in the CBA, refers any member of the bargaining unit " (Ex. Art. II, § 2).

23. The CBA states that all employees shall become members of PPA after thirty days of employment and thereafter maintain their membership therein for the duration of the CBA as a condition of continued employment (Ex. A, Art. IV, § 2).

**Probationary Employees**

24. The CBA provides that all newly hired officers are subject to an initial probationary period dependent upon the officer's qualifications and prior experience at the time of hire as follows: Officers graduating from the Police Academy are subject to a twelve-month probationary period and Experienced Officers (defined as officers having at least one year of full-time service or three years of part-time service with a recognized police force), are subject to a six-month

probationary period which cannot be extended without just cause and such extension is subject to the grievance process (*see* Ex. A, Art. IX).

25. The CBA sets a hard limit on the length of the probationary period for all officers who are Act 120 certified when hired of no more than twelve months from their date of employment (Ex. A, Art. IX, § 1).

**Disciplinary Action, Suspension & Discharge**

26. The CBA enumerates a right for Penn to discharge, suspend, or discipline any employee for "just cause," and sets forth pre-discharge "normal progressive disciplinary procedure" for non-probationary employees as follows: Oral warning, written warning, suspension without pay of up to ten working days, prior to discharge, except where the University determines that the severity of an employee's conduct warrants beginning discipline at a later step.( Ex. A, Art. XXVI, §1- 2).

27. The CBA further states that prior to suspending an officer without pay or termination, Penn is required to afford the employee "the opportunity to have a pre-disciplinary hearing before the Chief of Police, or his/her designee," held "not later than three (3) business days" after written notice of intent to suspend or terminate, where the officer may respond to such charges indicating why the intended action is not appropriate (Ex. A, Art. XXVI, § 4).

**Investigations of Complaints**

28. The CBA states "[a]ny member of the bargaining unit who is the subject of an internal or external complaint or investigation related to the performance of duties shall be provided with a redacted copy of the said complaint reasonably prior to being required or requested to submit to an interview regarding such charge" (Ex. A, Art. VII, § 3[d]).

29. Furthermore, CBA requires the Penn Police Department to "make every effort to conclude an investigation regarding the misconduct of an employee … within thirty (30) calendar days of receiving actual knowledge of the allegation of such misconduct," extendable only upon written notice to the PPA stating the reasons for the extension, and provides that "[i]f the investigation is extended past thirty (30) days, then it must be completed in sixty (60) days or [the] complaint is considered unfounded" (Ex. A, Art. VII, § 5).

30. "[F]irst offense, minor disciplinary infractions that are captured on … body worn camera will not result in an official internal investigation based solely upon this first offense minor infraction," and that "[d]igital recordings from body worn cameras shall not be randomly reviewed for the sole purpose of finding disciplinary infractions" (Ex. A, Understanding J).

**Disciplinary Records**

31. The CBA prohibits Penn from "insert[ing] any informal and/or formal disciplinary records into a system of records about an employee … unless the employee has an opportunity to review the document, receive a copy of same and submit written comments in response to the record" (Ex. A, Art. VII, § 2).

**Grievance Procedures**

32. The CBA defines a grievance as any dispute between the parties concerning the interpretation, application, or performance of the agreement, as well as any alleged breach of its provisions. Ordinarily, an employee or PPA must present the grievance orally to the employee's supervisor within thirty calendar days after the occurrence of, or knowledge of, the challenged event. Penn must provide its response to the employee and PPA within seven calendar days. If a PPA business representative requests to participate at Step 1, the grievance proceeds immediately to Step 2. (Ex. A, Art. XXVII, § 1).

33. If the grievance is not resolved at Step 1, the aggrieved officer and PPA may present it to the Chief of Police or the Chief's designee at Step 2 within seven calendar days after the Step 1 response. PPA may request a Step 2 meeting at which the parties may present witnesses and relevant records, after which the Chief of Police or designee must issue a written response (Ex. A, Art. XXVII, § 1).

34. If the matter remains unresolved, the employee and PPA may proceed to Step 3 by requesting a meeting with Penn's Director of Staff and Labor Relations or designee within fourteen calendar days after the Step 2 response. Thereafter, Penn must then arrange a meeting where witnesses and relevant records may again be presented and must issue a written response to PPA . (Ex. A, Art. XXVII, § 1).

35. The CBA establishes an expedited procedure for grievances challenging a suspension or discharge. Penn must notify PPA in writing of any suspension or discharge within three working days.

36. Thereafter, PPA must provide written notice within fourteen calendar days if it intends to contest the disciplinary action. Notwithstanding the bypass of a suspension or discharge grievance which may proceed directly to Step 3 of the grievance process. (Ex. A, Art. XXVI, § 5; Ex. A, Art. XXVII, § 2).

37. The CBA requires grievances and appeals to be pursued within the prescribed deadlines and provides that Penn fails to answer at any step, its failure is not treated as acceptance of the grievance; PPA may advance the grievance to the next step. Conversely, a grievance not timely presented is deemed waived, and a grievance not timely appealed treats Penn's response as conclusively resolved in accordance with the response. (Ex. A, Art. XXVII, §§ 2, 5).

38. Moreover, if a grievance remains unresolved after completion of Step 3, only PPA may invoke arbitration by providing written notice of its intent to arbitrate within fourteen (15) calendar days after Penn's Step 3 response and must file a formal demand with the American Arbitration Association within fourteen (14) calendar days thereafter. The CBA expressly denies individual employees the right to invoke arbitration independently, thereby requiring Corrado to rely upon PPA to pursue the final and binding stage of the contractual dispute-resolution process. (Ex. A, Art. XXVIII, §§ 1–2).

39. The CBA enumerates the sole right to pursue arbitration procedure to PPA and expressly denies any officer from bring an arbitration proceeding against Penn.

**<u>Corrado's Employment</u>**

40. Sometime in or near April 2023, the Penn extended Corrado a written offer of employment to serve as a police officer, of which, contained a sign-on bonus to be paid upon employment or shortly thereafter.

41. Corrado promptly accepted the offer of employment inclusive of the sign on bonus.

42. Accordingly, on or around April 7, 2025, Corrado began him employment at Penn as a Police Officer.

43. At the time of employment, Corrado had more than a year of experience as a full-time police officer, and accordingly was classified as a "newly hired experienced officer" subject to a six-month probationary period scheduled to conclude on October 7, 2025.

44. Approximately four months into his employment and while still within his initial six-month probationary period, Corrado received an Official Commendation, signed by the Penn

Police Department Chief of Police Derrick E. Wood, recognizing his role in apprehending suspects who had assaulted and robbed an unhoused individual.

45. Annexed hereto as "**Exhibit B**" is a true and correct copy of the Official Commendation.

**The Vehicle Accident**

46. Corrado completed all but 10 days of his probationary period without issue until September 27, 2025, when he was involved in an on-duty motor vehicle accident while operating a patrol vehicle during a response to an emergency involving an unidentified individual wielding a firearm ( the "Vehicle Accident").

47. As a result, thereof, Corrado sustained an injury to his hand causing him to be put on Injury on Duty ("IOD") status and began receiving workers compensation benefits.

48. Prior to any investigation into the Vehicle Accident had been completed, on or around October 7, 2025, Chief Wood issued a memorandum to Corrado titled "Extension of Probation," extending Corrado's probationary period from six to twelve months and stating that his probationary period was "now scheduled to end on April 7, 2026," i.e., twelve months from his original date of hire.

49. Annexed hereto as "**Exhibit C**" is a true and correct copy of the October 7, 2025, memorandum.

50. Corrado returned to full duty from IOD status on or around January 26, 2026,

51. More than four months after the Vehicle Accident, Penn Police Department Lieutenant Andrew Malloy was assigned to conduct a Safety Review Board ("SRB") hearing concerning the Vehicle Accident, despite thirty- and sixty-day investigative deadlines set forth in the CBA.

**The Memorandum Purportedly dated March 3, 2026**

52. On or around April 9, 2026, Corrado raised concerns regarding his unpaid sign-bonus with PPA's Vice President, Christopher Denshuick ("Officer Denshuick") and inquired as to when he would receive it.

53. During the conversation, Officer Denshuick brought up a written memorandum purported to be dated March 3, 2026, issued by the Penn Police Department's Captain, Christian Vandervort with the subject line: "CONCLUSION; SAFETY REVIEW BOARD HEARING; 2026-01."

54. Annexed hereto as "**Exhibit D**" is a true and correct copy of the memorandum purported to be dated March 3, 2026.

55. The memorandum contained multiple conclusions regarding the Vehicle Accident including: (1) the Vehicle Accident was preventable; (2) Corrado had failed to activate emergency warning devices; and (3) Corrado had entered a controlled intersection against a red signal.

56. Additionally, the memorandum implemented disciplinary action against Corrado directing that Corrado remain on non-driving status until he completed a driver training course with Sergeant Bernard Donovan and further extended his probationary period until July 26, 2026.

57. Prior to learning of the issuance of this memorandum during the conversation with Officer Denshuick referenced in paragraph 32 herein, Corrado had no notice or actual knowledge that a record containing conclusions adverse to his employment, implementing disciplinary action against him, and improperly extending his probation period beyond the twelve-month limit set fort in the CBA. On or around April 9, 2026, at Corrado's request, PPA 113 Vice President Christopher Denshuick ("Officer Denshuick") went to Deputy Chief Michael Belisairo's office to raise the

issue of Corrado's unpaid sign-on bonus, since Corrado's probationary period should already have concluded.

58. Unlike the October 7, 2025 memorandum, which bears a distribution list identifying six recipients including "PPA" and "File," the March 3, 2026 memorandum bears no distribution list and no indication that it was provided to PPA 113 or to any PPA representative. (Ex. C; Ex. D.)

59. Corrado received an actual copy of the memorandum from Officer Denshuick for the first time on or about April 11, 2026, more than five weeks after the date the memorandum bears, at which time he learned that his probationary period had been purportedly extended to July 26, 2026, and that he would not be receiving his sign-on bonus.

60. Prior to April 9, 2026, Corrado had no knowledge of the existence or contents of the March 3, 2026 memorandum, and no knowledge that it had been created, retained, or acted upon.

61. The March 3, 2026 memorandum recited multiple conclusions regarding the Vehicle Accident, including: (i) that the Vehicle Accident was "preventable"; (ii) that Corrado "failed to properly activate [his] emergency warning devices"; and (iii) that Corrado "entered a controlled intersection against a steady red signal while traveling at a high rate of speed." (Ex. D.)

62. The March 3, 2026 memorandum further found Corrado "in violation of UPPD Directive 26, Routine and Emergency Vehicle Operation," specifically Section IV(B)(1) and Section IV(E)(1) of that Directive. (Ex. D.)

63. Corrado disputes the memorandum's finding that he failed to activate his required emergency warning devices during the Vehicle Accident. CCTV footage shows Corrado's

emergency lights activated at the time of the Vehicle Accident; although that footage does not contain usable audio, Corrado attests that his siren was also activated at that time.

64. The March 3, 2026 memorandum imposed discipline and corrective action upon Corrado, directing that he "will remain on non-driving status until [he has] successfully completed a driver training course with Sergeant Bernard Donovan," and further purporting to extend his probationary period to July 26, 2026. (Ex. D.)

65. The March 3, 2026 memorandum purported to justify that extension on the theory that "the extended probationary period did not begin until your return to full duty on January 26, 2026" — that is, on the theory that the time Corrado spent on IOD status between September 27, 2025 and January 26, 2026 did not count toward his probationary period. (Ex. D.)

66. No provision of the CBA authorizes that calculation, and Penn had itself calculated Corrado's probationary period without any such tolling five months earlier, in the October 7, 2025 memorandum.

67. Penn had actual knowledge of the allegation of misconduct arising from the Vehicle Accident on September 27, 2025. The investigation was not concluded until March 3, 2026 , one hundred fifty-seven days later. Because that investigation was extended beyond thirty days and was not completed within sixty days, the complaint underlying it is, by the express terms of the CBA, "considered unfounded." (Ex. A, Art. VII, § 5.)

68. The findings recited in the March 3, 2026 memorandum, and the discipline, corrective action, and extension of probationary status imposed on the basis of those findings, therefore rest upon a complaint the CBA deems unfounded.

69. The March 3, 2026 memorandum expressly counted Corrado's on-duty injury and resulting absence against him, reciting among the consequences of the collision that it caused

"injuries that required you to miss work," and grounding the extension of his probationary period on the very period during which he was absent receiving workers' compensation benefits. (Ex. D.)

70. Penn did not provide Corrado an opportunity to review the March 3, 2026 memorandum, receive a copy of it, or submit written comments in response to it before it was issued, retained, or acted upon.

71. Upon information and belief, Penn never notified Corrado in writing of the outcome of the investigation of the Vehicle Accident

**Corrado's Grievances**

72. Corrado immediately complained about the issue to McCauley evidenced via text messages between Corrado and McCauley on April 9, 2026.

73. .Annexed hereto as "**Exhibit E**" is a true and correct copy of the text messages between Corrado and McCauley.

74. Corrado explained to McCauley: "I now completed my second probation … Now I am being put on 3rd probation with 0 notice … To be on probation for a year and a half is crazy. They did things incorrectly. You received no notice of my new probation and neither did I."

75. Furthermore, Corrado complained that by placing him on an additional probationary period, it put him in a "bad position" because he believed he could be fired for any reason at any time. Furthermore, Corrado explained being off probation protects his rights and requires the Penn to follow the "proper steps" if they decided to discharge him.

76. Although McCauley assured Corrado that he would be addressing the issue with "dc" and actively pursuing additional information , upon information and belief, McCauley failed to follow through with further inquiry.

77. In Fact, when Corrado followed up with him the next day for an update, McCauley brushed Corrado off by saying the "dc" was in a meeting and that he would get in contact with him later.

78. Upon information and belief, at the time, McCauley understood the actions of Penn personnel, particularly the improper investigation, the ill-founded conclusions of the Investigation, the second improper extension of Corrado's probationary period were all acts of retaliation against Corrado and were clear violations of Corrado's rights under the CBA.

79. Upon information and belief, McCauley further understood that Corrado was the target of attack methods commonly referred to as "railroading" where an employer begins to create an unfounded paper trail of disciplinary action and other adverse records against an employee with the intent to soon discharge the employee.

80. Upon information and belief, McCauley acted in concert in violating his rights under the CBA with Penn personnel by leading Corrado to believe he was addressing the issues and engaging the grievance process, when he was in fact doing the complete opposite.

**Corrado's Request to Review Employment File**

81. On or around April 20, 2026, Corrado asked McCauley to arrange for him to review the Penn Police Department personnel file.

82. Upon information and belief, at this time, McCauley was aware that Penn intended to discharge Corrado in the near future.

83. Upon information and belief, McCauley actively engaged in the pre-planned termination and violating Corrado's rights under the CBA by purposefully failing to pursue serious violations of the CBA through the grievance process, acting as an informant to Penn personnel, and coordinating with Penn personnel to effectuate Corrado's discharge.

84. Upon information and belief, McCauley concealed his involvement in the planned termination by representing Corrado to believe that he acting as his advocate in the matter. f

85. McCauley advised Corrado "they will try and set something up this week", however, upon information and belief, McCauley never intended to coordinate the file review process but instead, was buying time.

**Retaliation at the Penn Relay**

86. On or around April 23, 2026, McCauley, preemptively texted Corrado at 7:21 a.m. and informed him that he talked the" dc" and that he would set something up with Corrado regarding review of his personnel file.

87. The same day, on or around April 23, 2026, Corrado was assigned to a traffic-control post at Convention Avenue and South Street during the 2026 Penn Relays.

88. During the assignment, Corrado was subjected to repeated disciplinary actions for minor infractions and targeted for unusually strict enforcement of the Code of Conduct.

89. Corrado was accused of standing on a sidewalk rather than actively directing vehicle traffic at a congested intersection. In fact, Corrado was posted at one crosswalk while Officer Bernstein was posted at the other; Traffic Control Aides were present in the roadway directing vehicle traffic; and Corrado was, as he stated during his subsequent interview, "waiting for people to cross at the crosswalk" and thereafter "helping [Sergeant Weldon] with one of the lanes of traffic." (Ex. F.)

90. On one occasion during the April 23, 2026 detail, Sergeant Weldon directed Corrado to relieve the Traffic Control Aide in the intersection and take that position himself. Corrado, then working the crosswalk opposite Officer Bernstein at an intersection the officers and aides had running smoothly, did not do so, and said so directly when asked at his interview: "I had

a judgment call that if I took over it would go back to being a cluster since it was running smoothly, so I did not." (Ex. F.)

91. That single exercise of judgment at a congested detail Corrado had been instructed to keep running was the only occasion during Corrado's employment on which he declined to follow a supervisory direction. Corrado had never been counseled, warned, or disciplined for that or any other conduct.

92. Upon information and belief, Officer Bernstein, who was assigned to the same intersection and who was, in Corrado's account, "only crossing people at the crosswalk," was not disciplined for that conduct. (Ex. F.)

93. During the Penn Relays, Corrado was faulted merely for standing on the sidewalk rather than personally directing vehicular traffic at a congested intersection, even though Traffic Control Aides were present and, at times, performing that same function.

94. These minor infractions were later used as an excuse to discipline Corrado, create an inaccurate record of noncompliance, and create a inaccurate record that Corrado was insubordinate.

95. On or around April 24, 2026, Corrado was again assigned to the Penn Relay working a scheduled tour of 6:30 a.m. to 12:30 p.m. where Corrado was reprimanded for engaging in normal and typical conduct for amongst him and other police officers, such as going to lunch without directly informing his supervisor from approximately 11:38 a.m. to 12:04 p.m., during a shift on which officers were informally rotating breaks.

96. On that date, Corrado, Officer Carr, and Officer McKee were informally rotating meal breaks among themselves, a practice known to and tolerated by supervision. Officer Carr,

who was seated in ERT-1 with Sergeant Weldon, told Corrado, "Yo Corrado go to lunch." Corrado reasonably understood that direction to have come from Sergeant Weldon. (Ex. F.)

97. Corrado left at 11:38 a.m. and returned at 12:04 p.m. — a break of twenty-six minutes — during which the intersection remained staffed by Officers McKee and Carr and the ERT unit. (Ex. G.)

98. Upon information and belief, neither Officer Carr nor Officer McKee was disciplined for taking a meal break during the same rotation on the same shift.

99. Corrado told Sergeant Weldon that he needed to leave at the end of his tour at 12:30 p.m., and Sergeant Weldon responded, "yeah I know." Corrado did not leave his post before the end of his scheduled tour. (Ex. G.)

100. This reprimand was later used to create inaccurate disciplinary records that Corrado "abandoned his post" for simply taking his normal lunch break in the same manner the rest of his fellow officers did.

101. On the same day, an unruly crowd gathered and Corrado promptly addressed the situation by breaking up the crowd, yet was later accused of failing to actively assist officers managing the crowd.

102. On April 27, 2026, Penn issued Corrado an Intent to Interview Notification concerning the foregoing allegations.

103. On May 5, 2026, Corrado was interviewed by Penn Police Department Lieutenant Michael R. Dougherty regarding the allegations, and was represented by Officer Denshuick.

104. During the interview, Corrado disputed each allegation, including stating, as to the Shoemaker Green allegation, that his body-worn camera was activated during the relevant time period and would contradict the reporting supervisor's account.

105. Annexed hereto as "**Exhibit F**" is a true and correct copy of the interview transcript.

106. Upon information and belief, Corrado was not provided with a redacted copy of the complaint(s) underlying the Penn Relays allegations prior to the May 5, 2026 interview, as required under the CBA.

107. The allegation pertaining to the unruly crowd in was, upon information and belief, a first-offense allegation captured on Corrado's body-worn camera, and Corrado's body-worn camera footage would have contradicted the reporting supervisor's account, as Corrado stated during the May 5, 2026 interview.

**Corrado's Unlawful Discharge & Denial of the Grievance Process**

108. On or around May 6, 2026, Corrado, personally submitted a written grievance to the Deputy Chief concerning, among other things, Penn's issuance and use of the March 3, 2026, memorandum without providing him an opportunity to review or comment on it, and the resulting unauthorized extension of his probationary period.

109. A true and correct copy of Corrado's grievance statement is attached hereto as **Exhibit G**.

110. McCauley, let Corrado know that he had nothing to do with the grievance, essentially advising him he was on his own.

111. On May 8, 2026, Chief Wood issued Corrado a letter terminating his employment "effective immediately," stating that Corrado was being "terminated during [his] probationary period" and citing eleven separate provisions of the Penn Police Department Code of Conduct spanning Art.s I, II, V, VI, and VII of that Code.

112. Penn did not apply, and did not purport to apply, the progressive disciplinary procedure required by the CBA for employees who have completed their probationary period.

113. Penn instead relied exclusively on Corrado's purported continued probationary status as of May 8, 2026 as justification for his termination.

114. Upon information and belief, and subject to further discovery, Penn did not afford Corrado a pre-disciplinary hearing before the Chief of Police, or his designee, consistent with the requirements of Art. XXVI, § 4 of the CBA prior to issuing the May 8, 2026 termination letter.

115. Thereafter, on May 8, 2026, Corrado delivered a written termination grievance to

116. On May 15, 2026, McCauley informed Corrado by text message that he had submitted a further grievance concerning Corrado's termination to the Deputy Chief but stated expressly: "just so you know this is a grievance that you filed on your behalf! And the union didn't file it!"

117. Despite continued follow ups with McCauley as to the status of the termination grievance, McCauley stopped responding to Corrado's inquiries and no further grievance procedures were implemented.

118. Upon information and belief, to date the PPA has not served notice of intent to arbitrate or filed a demand for arbitration on Corrado's behalf concerning either grievance described above.

**<u>Exhaustion and Futility of Contractual Remedies</u>**

119. Corrado made all reasonable attempts to exhaust his administrative remedies under the CBA.

120. Corrado has attempted in good faith to pursue the grievance procedure available to him under the CBA, including by personally submitting the grievance described in Paragraph 48 above after the PPA did not do so on his behalf.

121. Further pursuit of the CBA's grievance and arbitration would be futile because: (a) Only the PPA, and not Corrado individually, may invoke the CBA's arbitration procedure under the CBA; (b) Upon information and belief, the PPA has not filed a demand for arbitration or otherwise acted to finally resolve Corrado's grievances notwithstanding the passage of time and its knowledge of the relevant facts; and (c) PPA's course of conduct in representing Corrado, as described throughout this Complaint, has been inadequate to protect Corrado's contractual rights.

122. Corrado is therefore entitled to pursue this direct judicial action for breach of the CBA against the University of Pennslyvania notwithstanding the CBA's grievance and arbitration provisions.

## COUNT I

## BREACH OF COLLECTIVE BARGAINING AGREEMENT
## 29 U.S.C. § 185
**(Against Penn)**

123. Corrado incorporates by reference each preceding paragraph as though fully set forth herein.

124. The CBA is a valid and binding contract between the University of Pennsylvania and PPA within the meaning of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

125. At all relevant times, Corrado occupied a position within the bargaining unit covered by the CBA and was entitled to the benefits and obligations of the CBA governing his employment.

126. Corrado was classified as a newly hired experienced officer because he had completed more than one year of full-time service with a recognized police force prior to joining Penn.

127. The CBA therefore established an initial six-month probationary period for Corrado, which was scheduled to expire on October 7, 2025.

128. Although the University could extend the probationary period of an experienced officer once for just cause, the CBA expressly subjected any extension beyond six months to the contractual grievance procedure.

129. Corrado was also certified under Act 120 when Penn hired him. Consequently, even if Penn possessed just cause to extend his initial six-month probationary period, the CBA prohibited Penn from maintaining his probationary status for more than twelve months from his April 7, 2025 date of employment.

130. The twelve-month maximum period permitted by the CBA expired no later than April 7, 2026.

131. Penn nevertheless purported to extend Corrado's probation through July 26, 2026, and subsequently relied upon that unauthorized extension to characterize Corrado as a probationary employee when it terminated him on May 8, 2026.

132. Penn breached the CBA in the following respects:

(a) Extending Corrado's initial six-month probationary period without establishing just cause and without administering the grievance procedure expressly applicable to that extension;

(b) Extending and recalculating Corrado's probation beyond the twelve-month maximum period permitted for an officer who was Act 120 certified when hired;

(c) Placing written records of discipline and conclusions adverse to him in his personnel file,

(d) Classifying Corrado as a probationary employee after April 7, 2026 and relying upon that unauthorized status to deny him the substantive and procedural protections afforded to an employee who completed probation;

(e) Continuing to rely upon the Vehicle Accident and the resulting "preventable" determination after the contractual deadline required the underlying complaint to be considered unfounded;

(f) Failing to provide Corrado a redacted copy of the complaint or complaints underlying the Penn Relays investigation reasonably before requiring him to submit to the May 5, 2026 interview

(g) Initiating and relying upon an official investigation of first-offense, minor infractions captured by Corrado's body-worn camera, and using body-worn-camera evidence for the purpose of identifying or supporting disciplinary infractions, contrary to Understanding J of the CBA;

(h) Terminating Corrado without just cause after his authorized probationary period had expired (Ex.

(i) Terminating Corrado without applying the progressive disciplinary procedure governing employees who completed probation and without providing him a pre-disciplinary hearing to present the basis for the proposed termination and providing Corrado with opportunity to respond to the charges

(j) Relying upon materially disputed allegations concerning conduct for which similarly situated officers were not disciplined, including allegations that Corrado abandoned his post by taking an ordinary meal break and failed to perform duties that his body-worn-camera evidence showed he performed;

(k) Failing to timely and properly administer Corrado's May 6, 2026 grievance concerning the unauthorized extension of his probation and the March 3, 2026 memorandum; and

(l) Failing to administer the grievance procedure applicable to Corrado's May 8, 2026 discharge.

133. Corrado made timely and good-faith efforts to invoke the grievance procedure by notifying PPA and McCauley of the unauthorized probation extension, submitting a written grievance on May 6, 2026, and requesting that his May 8, 2026 termination be grieved.

134. Corrado was prevented from completing the contractual process because PPA failed and refused to properly file, process, advance, and arbitrate his grievances.

135. As a direct and proximate result of Penn's breaches, Corrado has suffered lost wages, overtime compensation, shift-differential compensation, pension contributions, health and welfare benefits, seniority, diminished earning capacity, and other consequential damages.

136. WHEREFORE, Corrado requests judgment against Penn and an award of back pay and lost benefits; reinstatement or front pay in lieu of reinstatement; restoration of seniority and pension rights; expungement or correction of the improper probation, disciplinary, and termination records; pre- and post-judgment interest; recoverable costs; and all further relief the Court deems appropriate.

## COUNT II

## BREACH OF THE DUTY OF FAIR REPRESENTATION
## (Against PPA)

137. Corrado incorporates by reference each preceding paragraph as though fully set forth herein.

138. At all relevant times, PPA was the exclusive collective-bargaining representative of Corrado and the bargaining unit in which he was employed.

139. As Corrado's exclusive representative, PPA owed him a duty of fair representation under federal labor law.

140. That duty required PPA to refrain from representing Corrado in a manner that was arbitrary, discriminatory, or undertaken in bad faith.

141. PPA is responsible for the conduct of its officers and authorized representatives, including Joseph McCauley and Christopher Denshuick, when acting within the scope of their union responsibilities.

142. Corrado notified McCauley on April 9, 2026 that Penn placed hm on a third probationary period, that neither Corrado nor PPA had received timely notice of the extension, and that the extension exposed him to discharge without the protections available to a non-probationary employee.

143. McCauley led Corrado to believe that he was investigating the matter and communicating with Penn management on Corrado's behalf.

144. Corrado also asked McCauley to assist him in reviewing his personnel file so that he could determine what records Penn had created and intended to use against him.

145. Despite those assurances, PPA and McCauley failed to initiate or meaningfully pursue a grievance concerning the March 3, 2026 memorandum or the unauthorized extension of Corrado's probation.

146. When Corrado personally submitted his May 6, 2026, grievance, McCauley disclaimed PPA involvement and advised Corrado, in substance, that Corrado was proceeding on his own.

147. After Penn terminated Corrado on May 8, 2026, Corrado timely requested that PPA contest the discharge.

148. On May 15, 2026, McCauley represented that he had delivered a grievance concerning Corrado's termination to the Deputy Chief, but expressly stated that the grievance had been filed by Corrado personally and that "the union didn't file it."

149. PPA thereafter failed to request or participate in the Step 3 procedure applicable to a discharge grievance, failed to secure a written determination from the University, failed to advance the grievance after the University failed to respond, and failed to invoke arbitration.

150. PPA failure was particularly consequential because the CBA denied Corrado the individual right to invoke arbitration and vested that authority exclusively in PPA.

151. PPA did not provide Corrado with a reasoned determination that his grievances lacked merit, identify any investigation it conducted, explain why it declined to proceed, or notify Corrado that it intended to abandon the grievances before the applicable deadlines expired.

152. Upon information and belief, PPA acting through McCauley and/or other representatives:

Failing to conduct even a minimal investigation into whether the University exceeded the CBA's six- and twelve-month probationary limits;

Disregarding the plain language of Article IX, Section 1;

Failing to obtain and review the October 7, 2025 and March 3, 2026 memoranda and the records underlying the University's investigation;

Failing to obtain or review the body-worn-camera evidence identified by Corrado as contradicting the accusations against him;

Failing to investigate the University's disparate enforcement of its meal-break and assignment practices;

Failing o properly present or advance Corrado's timely grievances;

Misleading Corrado into believing his complaints were being addressed while allowing mandatory grievance and arbitration deadlines to expire;

Refusing to sponsor Corrado's grievances while knowing that the CBA prohibited Corrado from independently invoking arbitration;

Failing to assign an alternate representative after McCauley declined to act on behalf of the Union; and

Communicating and/or acting in concert with Penn personnel for the purpose of facilitating Corrado's discharge or preventing meaningful review of that discharge.

153. PPA ;s handling of Corrado's grievances was not merely negligent or the product of a reasoned strategic determination. Its conduct was perfunctory, wholly irrational considering the express language of the CBA, and undertaken in bad faith.

154. PPA s breach extinguished Corrado's contractual ability to obtain a final and binding arbitral determination of whether the University violated the CBA.

155. Penn's breach of the CBA and PPAs breach of its duty of fair representation constitute an interdependent hybrid action under § 301 of the LMRA.

156. As a direct and proximate result of PPA 's breach, Corrado lost the opportunity to obtain reinstatement, back pay, restoration of benefits and seniority, and correction of his employment records through the contractual process.

157. WHEREFORE, Corrado requests judgment against PPA, compensatory relief for the damages caused by its breach and apportioned according to federal labor law; equitable relief necessary to restore Corrado's contractual rights; pre- and post-judgment interest; recoverable costs; and all further relief the Court deems appropriate.

**COUNT III**

**BREACH OF INDIVIDUAL EMPLOYMENT AGREEMENT**
**(Against Penn)**

158. Corrado incorporates by reference each preceding paragraph as though fully set forth herein.

159. Penn provided Corrado a written offer of employment under which it promised to pay him a sign-on bonus.

160. Corrado accepted Penn's offer and commenced employment in reliance upon its terms.

161. Corrado performed every condition required to earn the promised sign-on bonus and was due to him upon start of his employment.

162. Penn's promise to pay the sign-on bonus arose from Corrado's individual written employment agreement and exists independently of the CBA.

163. No interpretation of the CBA is required to determine whether Corrado satisfied the conditions stated in the individual offer or whether the University failed to pay the promised bonus.

164. Penn failed and refused to pay Corrado the sign-on bonus after it became earned and payable.

165. Penn failure to pay the earned bonus constitutes a material breach of Corrado's individual employment agreement.

166. As a direct and proximate result of that breach, Corrado has suffered damages equal to the unpaid bonus, together with applicable interest and consequential damages recoverable under Pennsylvania law.

167. WHEREFORE, Corrado requests judgment against the Trustees of the University of Pennsylvania in the amount of the unpaid sign-on bonus, together with pre- and post-judgment interest, recoverable costs, and all further relief the Court deems appropriate.

## COUNT IV

## VIOLATION OF THE PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW 43 P.S. § 260.1 et seq. (Against Penn)

168. Corrado incorporates by reference each preceding paragraph as though fully set forth herein.

169. At all relevant times, Penn was Corrado's employer within the meaning of the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.2a.

170. Penn's written offer of employment obligated it to pay Corrado a sign-on bonus.

171. Corrado satisfied every condition necessary to earn the sign-on bonus.

172. The earned sign-on bonus constituted wages or compensation within the meaning of the WPCL.

173. Penn failed to pay the earned bonus on the applicable regular payday or within the period required following the termination of Corrado's employment.

174. Penn has continued to withhold the bonus despite Corrado's demand for payment.

175. Penn has no good-faith basis for withholding the earned bonus because Corrado satisfied the express conditions upon which payment depended.

176. Under 43 P.S. § 260.9a, Corrado is entitled to recover the unpaid compensation and reasonable attorneys' fees incurred in this action.

177. Since the compensation has remained unpaid for the period prescribed by 43 P.S. § 260.10 and no good-faith dispute justifies its withholding, Corrado is also entitled to liquidated damages equal to twenty-five percent of the unpaid compensation or $500, whichever is greater.

178. WHEREFORE, Corrado requests judgment against Penn for the unpaid sign-on bonus; liquidated damages under 43 P.S. § 260.10; reasonable attorneys' fees and costs under 43 P.S. § 260.9a; pre- and post-judgment interest; and all further relief the Court deems appropriate.

## COUNT V

## WRONGFUL DISCHARGE IN VIOLATION OF PENNSYLVANIA PUBLIC POLICY— RETALIATION FOR PURSUING WORKERS' COMPENSATION BENEFITS (Pleaded in the Alternative Against Penn)

179. Corrado incorporates by reference each preceding paragraph as though fully set forth herein.

180. On September 27, 2025, Corrado sustained a work-related hand injury in an on-duty motor-vehicle accident while responding to an emergency involving an individual reportedly armed with a firearm.

181. Corrado reported the injury, was placed on Injury on Duty status, and sought and received workers' compensation benefits and related medical treatment.

182. Corrado's pursuit and receipt of workers' compensation benefits constituted protected conduct under the public policy of the Commonwealth of Pennsylvania.

183. Penn knew that Corrado had sustained a compensable work injury and had pursued and received workers' compensation benefits.

184. Shortly before Corrado's initial probationary period was scheduled to expire, Penn extended his probation purportedly because the investigation associated with the work-related accident remained pending.

185. Penn then delayed its investigation of the Vehicle Accident for several months beyond the deadlines established by the CBA.

186. Corrado returned to full duty from IOD status on or about January 26, 2026.

187. Following his return, the University subjected Corrado to heightened scrutiny, extended and recalculated his probation to account for or otherwise rely upon the period during which he was absent on IOD status, created and placed adverse records in his personnel file, and treated ordinary or minor workplace conduct as grounds for discipline.

188. On May 8, 2026, Penn terminated Corrado's employment while continuing to rely upon the probationary status that it had extended following his work injury and receipt of workers' compensation benefits.

189. The stated reasons for Corrado's termination—including disputed allegations concerning an ordinary meal break, his location while assigned to traffic control, and his response to a crowd—were exaggerated, selectively enforced, factually unsupported, and/or inconsistent with the University's treatment of similarly situated officers.

190. The temporal sequence, Penn's repeated reliance upon the Vehicle Accident and IOD period, the delayed investigation, the extension of Corrado's vulnerable probationary status, the heightened scrutiny following his return, and the weakness and inconsistency of the stated grounds for discharge support a reasonable inference that Corrado's work injury and pursuit of workers' compensation benefits were a substantial and determinative factor in the University's decision to terminate him.

191. Penn would not have terminated Corrado in the absence of his work injury and pursuit of workers' compensation benefits.

192. Terminating an employee for pursuing workers' compensation benefits violates the clear public policy of the Commonwealth of Pennsylvania.

193. Corrado's claim under this Count arises from an independent, nonnegotiable duty imposed by Pennsylvania law and does not require interpretation of the CBA.

194. As a direct and proximate result of Penn's retaliatory conduct, Corrado has suffered lost wages and benefits, diminished earning capacity, emotional distress, humiliation, inconvenience, and damage to his professional reputation.

195. Penn's conduct was willful, malicious, and/or undertaken with reckless indifference to Corrado's legally protected rights, thereby warranting punitive damages.

196. WHEREFORE, Corrado requests judgment against the Penn for back pay and lost benefits; reinstatement or front pay; compensatory damages, including damages for emotional distress and reputational harm; punitive damages; pre- and post-judgment interest; recoverable costs; and all further relief the Court deems appropriate.

Dated: October 2, 2026

Respectfully submitted,

By: *__/s/ Joseph T. Carr__*

Joseph T. Carr, Esquire
Attorney ID: 333509
P.O. Box 43
Mount Joy, PA 17552
(717) 333-3270
attorney@joecarrlaw.com
Attorney for Plaintiff

# EXHIBIT A

# COLLECTIVE BARGAINING AGREEMENT

between

The Penn Police Association

and

The Trustees of the University of Pennsylvania

August 1, 2023 - July 31, 2026

## TABLE OF CONTENTS


Preamble ........ 1
Article I, Recognition ........ 1
Article II, Definitions ........ 1
Article III, Management Rights/Employment ........ 2
Article IV, PPA Membership ........ 3
Article V, Non-Discrimination ........ 4
Article VI, Check-Off ........ 5
Article VII, Employee Rights ........ 5
Article VIII, No Strike - No Lockout ........ 9
Article IX, Probationary Employees ........ 9
Article X, PPA Activity and Visitation ........ 10
Article XI, Bulletin Boards ........ 11
Article XII, Seniority ........ 12
Article XIII, Working Hours ........ 13
Article XIV, Wages ........ 14
Article XV, Overtime ........ 14
Article XVI, Call Pay ........ 15
Article XVII, Shifts & Shift Differentials ........ 16
Article XVIII, Health Welfare and Education ........ 17
Article XIX, Layoff and Recall ........ 21
Article XX, Sick Leave ........ 22
Article XXI, Bereavement Leave ........ 26
Article XXII, Paid Time Off ........ 27
Article XXIII, Personal Days ........ 29
Article XXIV, Holidays ........ 29

Article XXV, Military Leave .................................................. 30
Article XXVI, Discipline and Discharge ................................ 31
Article XXVII, Grievance Procedure .................................... 33
Article XXVIII, Arbitration .................................................... 36
Article XXIX, Pension ......................................................... 37
Article XXX, Separability .................................................... 38
Article XXXI, Integration Agreement ................................... 39
Article XXXII, Posting and Promotion.................................. 39
Article XXXIII, Effective Date and Duration ........................... 40
Understanding A, Special Duty Selection ............................. 41
Understanding B, Re-employment Consideration ................ 41
Understanding C, Reduced Hour Work Schedule ................ 41
Understanding D, Exchanging Assignments ........................ 44
Understanding E, Labor Management Committee(s) ........... 44
Understanding F, Joint Committee to Study Altered Work Schedule ............................................................................ 44
Understanding G, Joint Committee to Study Additional Longevity Steps. ................................................................... 44

## Preamble

The University of Pennsylvania and the University Police Department, hereinafter referred to as "Employer," and the Penn Police Association, hereinafter referred to as "PPA," agree as follows:

## ARTICLE I, Recognition

The employer recognizes the PPA as the exclusive collective bargaining representative for the bargaining unit defined in Article II, Section 1, hereof. The employer also recognizes that members of the PPA have certain rights granted by the National Labor Relations Act, this Collective Bargaining Agreement, as well as other applicable laws.

## ARTICLE II, Definitions

Except as otherwise herein defined, unless the content requires a different meaning, the following definitions shall apply throughout this Agreement:

1) Bargaining Unit: The bargaining unit shall consist of a group of employees employed by the Employer as University Police Officers, Corporals, and Detectives. All other positions are specifically excluded from the bargaining unit. In defining the bargaining unit, the parties intend to include only those positions covered by certification of the National Labor Relations Board issued July 11, 1991, in Case No. 4-RC-17628, and any amendments thereto.

2) Employees: When used in this Agreement, the word "employee" refers to any member of the bargaining unit.

3) University Seniority: The length of time an employee has been continuously employed in any capacity by the Employer.

4) Bargaining Unit Seniority: The length of time an employee has worked continuously in a specific job classification(s) within the bargaining unit.

5) Regular Rate of Pay: The straight time rate of pay per hour for the pay grade assigned to an employee's regular job classification, exclusive of any premium.

6) The masculine shall include the feminine; the singular shall include the plural.

**ARTICLE III, Management Rights/Employment**

*Section 1.* All management functions, rights, and responsibilities which the Employer has not expressly modified or restricted by a specific provision of this Agreement are retained and vested exclusively in the Employer. Without limiting the generality of the foregoing, the Employer retains the exclusive rights to direct and schedule the working force; to plan, direct and control operations, to hire, promote, transfer, lay off and recall employees to work; to determine whether to fill vacancies, to determine the number of employees and the duties to be performed; to reprimand, suspend, discharge or otherwise discipline employees for cause; to determine methods and means for performing work; to determine the uniforms to be worn and equipment to be used by employees; to make rules, regulations, policies and practices not inconsistent with the terms of this Agreement; to conduct random tests on the employees for drug and alcohol use; and otherwise generally to manage the facilities of the Employer so as to attain and maintain full operating efficiency.

*Section 2.* The PPA agrees to cooperate with the Employer to attain and maintain full efficiency in its operations and the Employer agrees to receive from the PPA constructive suggestions, which the Employer shall, in its sole discretion, consider.

*Section 3.* A copy of the University's Policy Manual and

Department's Policy and Procedures Manual shall be maintained in the Department. The same shall be made available to members of the bargaining unit at all times for their review.

*Section 4.* The Employer shall have the right to evaluate the performance of each employee in the bargaining unit twice per year. The recording of such evaluation in writing may be done and maintained as part of the employee's departmental personnel file. The evaluation, standing alone may not serve to justify use of the formal discipline process. The employee has a right to respond to the evaluation in writing. Such response shall also become a part of the employee's departmental personnel file.

*Section 5.* In cases where the officer receives the performance rating of "Needs Improvement," the officer must work with Management and the PPA in developing an improvement plan in order to address the correction of the identified deficiency(ies). Failure to successfully complete the performance plan may result in the contractually agreed upon discipline process.

**ARTICLE IV, PPA Membership**

*Section 1.* All present employees who are members of the PPA shall maintain their membership in good standing in the PPA for the duration of this Agreement as a condition of continued employment.

*Section 2.* All employees hired on or after the effective date of this Agreement shall become members of the PPA thirty (30) days after employment and thereafter maintain their membership therein for the duration of this Agreement as a condition of continued employment.

*Section 3.* For the purposes of this Agreement, an employee shall be considered a member in good standing of the PPA if

he tenders his initiation fee and such periodic membership dues as are uniformly required by the PPA as a condition of membership.

*Section 4.* The University shall supply the President of the PPA with a list of its employees covered by this Agreement, with length of service noted as of the effective date of this Agreement. The University shall supply the PPA with a list of Lieutenants and Sergeants as of the same date and advise the PPA of changes thereafter. The PPA shall supply the University with a list of PPA representatives as of the same date and advise the University of any changes thereafter. The University shall send to the Local President of the PPA, after the end of each month, a list showing hires, layoffs, transfers, and terminations during the preceding month.

*Section 5.* The Employer assumes no obligation, financial or otherwise, arising out of the provisions of this Article, save those obligations specifically imposed upon the Employer by this Article. The PPA shall indemnify and hold the Employer harmless from any and all claims, grievances, arbitrations, awards, suits or other proceedings arising out of, or by reason of, any action taken by the Employer for the purpose of complying with any of the provisions of this Article.

## ARTICLE V, Non-Discrimination

*Section 1.* The parties to this Agreement agree that there shall be no discrimination by either party based on age, color, creed, national origin, race, sex, disability or veteran status, sexual orientation, or gender identity ,regarding referral for employment, employment, advancement, working conditions, rates of pay, and acceptance into PPA membership.

*Section 2.* The University agrees not to interfere with the rights of the employees to become members of the PPA. There shall be no discrimination or coercion by the University or any University representative because of PPA membership;

or because of any employee activity in an official capacity on behalf of the PPA; or for any other cause related to PPA activity by the University or any University representative.

## ARTICLE VI, Check-Off

*Section 1.* Upon receipt of written authorization from an employee, on the appropriate form, the Employer shall, pursuant to such authorization, deduct from the wages due of such employee the initiation fee and such periodic membership dues as are required by the PPA and remit the funds so deducted to the PPA at a place to be designated by the PPA.

*Section 2.* The Employer shall submit to the PPA each month all deductions for dues and initiation fees made from the wages of employees for the preceding month.

*Section 3.* Deductions shall be made from the employee's first paycheck each month and shall be forwarded within ten (10) working days of collection or as soon thereafter as possible to the PPA.

## ARTICLE VII, Employee Rights

*Section 1.* A bargaining unit employee or his/her representative when authorized in writing, will have the right during his non-work hours, on request, and at reasonable times, to examine material contained in his departmental or Division of Human Resources' personnel record when done in the presence of a designated official of the respective departments. A copy of any such material will be furnished to the employee when determined by the employee to be necessary to pursue his rights under this Agreement, University policy or applicable law.

*Section 2.* The University, including the Police Department may not insert any informal and/or formal disciplinary records into a system of records about an employee in the bargaining unit unless the employee has an opportunity to review the

document, receive a copy of same and submit written comments in response to the record.

*Section 3.*

(a) If an employee of the bargaining unit is being interviewed by the University Police Department concerning the exercises of police duties that resulted in the use of his firearm, use of physical force, the employee will have the right, upon his request, to have an PPA legal representative present during such interview to counsel him/her about his legal and contractual rights.

(b) Any member of the bargaining unit who is the subject of an internal or external, non-criminal complaint will be notified in writing 24-hours prior to any interview on said complaint. Once the investigation is completed, the member and the union will be notified in writing regarding the outcome of the investigation.

(c) If the interviewed Police Officer submits a written statement, a transcript, or a mechanical record is made, a copy of same must be given to the interviewed Police Officer upon request and without cost.

(d) Any member of the bargaining unit who is the subject of an internal or external complaint or investigation related to the performance of duties shall be provided with a redacted copy of the said complaint reasonably prior to being required or requested to submit to an interview regarding such charge.

*Section 4.* In the event an employee is required to be interviewed by the University Police Department regarding performance/conduct and such employee feels that discipline can reasonably be the result of such interview, the employee has the right, upon request, to have a PPA representative present during the interview.

*Section 5.* The University Police Department will make every effort to conclude an investigation regarding the misconduct of an employee in the bargaining unit within thirty (30) calendar days of receiving actual knowledge of the allegation of such misconduct. When, in the determination of the Police Department, the time frame for such investigation will exceed thirty (30) days the designated PPA representative will be notified in writing stating the reason (s) for the extension of the expected completion date. In no event shall the investigation be delayed for reasons that are arbitrary. If the investigation is extended past thirty (30) days, then it must be completed in sixty (60) days or complaint is considered unfounded.

*Section 6.* Under the provisions of the Department of Education and the Municipal Police Officer Education and Training Commission (MPOETC), employees hired as Police Officers will not carry firearms until commissioned. If the guidelines of the Department of Education or the Municipal Police Officer Education and Training Commission (MPOETC) change, making the present contract language inapplicable, the parties agree to meet and discuss.

*Section 7.* In the event that all days off must be canceled, the decision for such cancellation shall be made by the Chief of Police or designee and the shifts so affected shall be notified within a reasonable time after the Chief of Police or designee becomes aware of the need for cancellation.

For regularly scheduled yearly events, management will ask for volunteers to staff the event twenty-one (21) days in advance of the anticipated date of the event. If the detail cannot be fully staffed by volunteers two (2) weeks prior to the anticipated date, management will staff the detail in reverse seniority order.

*Section 8.* An employee in the bargaining unit who has sustained either an injury or sustained illness, may request an alternative assignment. Whenever such a request is made, it

must be supported by a statement from the employee's attending physician, indicating the nature of the employee's medical condition, the extent of the employee's limitation to perform his/her normal duties based upon the job description and the time period of expected improvement or recovery.

Whenever possible, based upon the need to have bona fide work performed, the Chief of Police, or his designee, will assign the employee to such alternative duty when the employee qualifies and has the ability to perform the alternative duties in the sole judgment of the Department, to perform such an assignment. The Department reserves the right, at its own cost, to require the employee to be examined and periodically reexamined by an independent physician.

*Section 9.* If congress passes a "police officer bill of rights," management will consider the national "bill of rights" for adoption by the department.

*Section 10.*

(a) Employees will be permitted to engage in outside employment subject to the Outside Employment Directive. Outside employment may take place provided:

1. Prior authorization is obtained.
2. The scope of employment does not demean the image of the University of Pennsylvania Police Department.
3. There is no conflict with the employee's primary duties as an employee of the University of Pennsylvania Police Department.
4. The outside employment does not interfere with the employee's ability to perform his duties properly.

(b) If an employee submits a request for authorization to engage in outside employment, management shall endeavor to respond to the request within two (2)

weeks.

(c) Outside employment shall not be arbitrarily denied, but may be denied, with just cause, in writing within thirty (30) days.

(d) Employees who have been approved to engage in outside employment must submit in advance a monthly schedule of their outside employment if it is known.

**ARTICLE VIII, No Strike - No Lockout**

It is mutually agreed by the parties that there will be no lockout, strike, work stoppage, or slow down during the term of this Agreement. In the event one or more employees fail to abide by the provisions of this Article, the University retains full right to take any disciplinary action it deems necessary, including discharge. Employees disciplined under the provisions of this Article may resort to the grievance procedure.

**ARTICLE IX, Probationary Employees**

*Section 1.* The probationary status will be a period of twelve (12) months from the date of graduation from the Police Academy. Employees in a probationary status may be disciplined or discharged without recourse to the grievance procedure. The probationary period for an employee who is certified under Act 120 at the time of employment shall be a period not to exceed twelve (12) months from the date of employment.

Newly hired experienced officers will be in probationary status for six (6) months. Experienced is defined as having one year of full-time service or three years of part time service with a recognized police force. Probationary periods for these officers cannot be extended without just cause. Any extension of the period beyond six (6) months is subject to the grievance procedure as defined in this contract.

*Section 2.* Upon successful completion of the probationary period, the employee's seniority shall date retroactively to the most recent date of employment.

**ARTICLE X, PPA Activity and Visitation**

*Section 1.* The Employer recognizes that the PPA shall have the right to appoint as many as twelve (12) representatives. The PPA will, thirty (30) days after execution of this Agreement and annually thereafter, advise the Employer in writing of the names of such representatives and respective roles; if and when changes are made, the PPA will promptly notify the Employer of such changes.

*Section 2.* The representatives appointed by the PPA shall receive no additional compensation from the Employer as a result of such agreement.

*Section 3.* Such representatives may be permitted to spend such times during working hours as are reasonably necessary in processing formal grievances relative to this Agreement without suffering loss of pay or benefits. If such matters require immediate attention, provided they first obtain permission to leave their work area from the immediate supervisor and notify the supervisor upon their return, such permission shall not be unreasonably withheld, but may not be granted if it interferes with the efficient operation of the Employer at that time. If denied, release time should be scheduled as soon as possible.

*Section 4.* A business representative of the PPA shall have reasonable access to the Employer's premises during normal business hours for the purpose of conferring with the Employer, with employees and for the purpose of administering this Agreement. Where such business representative finds it necessary to enter the department of the Employer for this purpose, he/she shall first advise the University's Director of

Staff and Labor Relations, or designee, as the Employer shall state. Such visitation during the Employer's non-business hours shall be restricted to public areas or such areas previously provided for by the Director of Staff and Labor Relations, or designee. All other onsite inspections or visitations shall be with prior notification to the Director of Staff and Labor Relations, or designee.

*Section 5.* No employee shall engage in any PPA activity, including the distribution of literature, which could interfere with the performance of his/her work or the work of other employees during their working time except as provided for in this Agreement.

*Section 6.* The University will grant time off from work with pay to three (3) elected Penn Police Association Board Members up to a combined total of twenty (20) days. This time is intended for the purpose of attending Penn Police Association conferences and for PPA business. For such time to be granted, the University shall be notified by the Board Member in writing ten (10) working days in advance unless there is an emergency conference/meeting called that the PPA had no prior knowledge.

*Section 7.* For the two (2) months prior to the expiration of the collective bargaining agreement, three (3) bargaining unit members, on different shifts from one another, may participate in negotiations in lieu of their scheduled tour of duty for the day on which the parties meet. Time participating in negotiations is not considered time worked for all overtime purposes.

**ARTICLE XI, Bulletin Boards**

The Employer shall provide a bulletin board, which may be used by the PPA for posting official PPA notices. All postings to be approved by PPA President, approval indicated by his/her signature.

## ARTICLE XII, Seniority

*Section 1.* Commencement: An employee's seniority shall commence after the completion of his/her probationary period and shall be retroactive to the date of his most recent hire.

*Section 2.* Accrual:

(a) University seniority shall continue to accrue during a continuous authorized leave of absence without pay, during an authorized leave of absence with pay, during a period of continuous layoff, during sick leave and during PPA leave.

(b) Bargaining unit seniority shall accrue during the periods specified in Section 2 (a) of this Article as well as during the time an employee works in a specific job classification in the bargaining unit.

*Section 3.* Loss of Seniority: An employee's seniority shall be lost when he/she:

(a) terminates voluntarily;
(b) is discharged for cause;
(c) is laid off for a period of one year;
(d) willfully exceeds an authorized leave of absence;
(e) fails to return to work within ten (10) consecutive days after due notification of recall from layoff without the employee so recalled notifying the Employer during said (10) days of a bona fide reason why he cannot return to work;
(f) fails to report for work for three (3) consecutive days and fails to make proper notification to the Employer as to the reasons for such absence (unless physically unable to do so).

*Section 4.* Application: University seniority shall apply in the computation and determination of eligibility for all benefits provided for by this Agreement in which length of service is a factor, unless specifically indicated otherwise.

*Section 5.* Seniority: Vacation requests will be evaluated on the basis of bargaining unit seniority in the event there are requests covering the same period.

Employer will make reasonable efforts to fairly distribute overtime on the basis of bargaining unit seniority. Special skills, training, or qualifications necessary for the overtime assignment shall also be a factor for the distribution of certain overtime assignments.

Seniority shall be a factor in promotions, if, in the opinion of management, the awarding of the position cannot be made on the basis of experience, training, ability, and dependability. Management will then award the position to the senior bidder who is so qualified to perform the duties of the position.

In matters of promotional testing, each employee will receive credit for their seniority in the written portion of the testing procedure. They will be credited with one-tenth (0.1) of a point for each year of service in the University of Pennsylvania Police Department, up to a maximum credit of two (2) points for twenty (20) years of service.

## ARTICLE XIII, Working Hours

*Section 1.* The regular work week shall be forty (40) hours, consisting of four (4) ten (10) hour shifts within the period of Monday through Sunday.

*Section 2.* The regular work day shall consist of ten (10) continuous work hours within a twenty-four (24) hour period beginning with the starting time of the employee's regularly scheduled shift.

*Section 3.* Each regular full-time employee shall normally receive three (3) days off in each work week with at least two (2) of those days being consecutive as defined in Section 1 of

this Article, except in the event of an emergency or overtime.

*Section 4.* All ten (10) hour tours shall include a half-hour (½) paid meal period. During the lunch period, the Officer will remain on call. Compensation for each meal period shall be paid in accordance with the pay for the shift in which such meal period falls.

**ARTICLE XIV, Wages**

*Section 1.* Wage rates for employees in the bargaining unit are created by a Memorandum of Agreement to this Agreement.

Section 2. Wage increases due to years of service (longevity) will be calculated and processed in the week of the employee's anniversary of working in the Penn Police Department.

Section 3. It should be noted that Shift Differential was factored into the salary base of the Detectives in 2002.

**ARTICLE XV, Overtime**

*Section 1.* Employees shall be paid one and one-half (1½) times their regular straight time rate of pay for all time worked in excess of forty (40) hours in a work week and ten (10) hours in a workday.

*Section 2.*
Any two (2) consecutive days off (RDO's) worked for overtime purposes the 2nd day worked will be paid at double time, provided the officer worked the majority of their regular shift hours on their first RDO; For overtime calculation purposes, the twenty-four (24) hour RDO starts at midnight.

*Section 3.* All paid time shall be considered time worked with the exception of non-job-related sick leave.

*Section 4.* The amount of overtime and the employees required to work such overtime shall be established by the Employer. Reasonable efforts will be made to distribute overtime fairly and equitably on the basis of bargaining unit seniority, provided the employee is qualified to do the job assignment. Any employee who accepts an overtime assignment and who then fails to report for such overtime shall be passed over for overtime assignment the next time s/he is eligible.

*Section 5.* Any employee scheduled to work overtime on his/her scheduled first day off and who fails to report for work on the day preceding the scheduled first day off shall forfeit his right to work overtime until all others of lesser seniority have had the opportunity to work overtime. Furthermore, any employee who cancels his/her attendance for an accepted overtime detail less than 24-hours prior to the detail will be ineligible for consideration for the next two (2) overtime detail offerings.

*Section 6.* There shall be no duplication or pyramiding in the computation of overtime and other premium pay.

**ARTICLE XVI, Call Pay**

*Section 1.* Employees who are called to work at other than their normally scheduled work hours shall receive a guaranteed minimum of pay for four (4) hours unless such hours are contiguous to the employees' normal hours of work.

*Section 2.* A bargaining unit employee who is required to attend court duty or preparation thereof in performance of official University responsibilities during a period outside the employee's normal tour of duty, shall be entitled to a guarantee of four (4) hours minimum pay. Should the employee be required to stay beyond the four hours, he/she will be compensated on an hourly basis for any completed hour or

fraction thereof in tenths. Calculation of the pay rate for such time shall be in accordance with the overtime provision of this article, when appropriate.

Section 3. Employees who routinely work evening or night shifts and are required to attend court will be provided a two (2) hour leeway when reporting to work a full shift before or after the court appearance. This time may be taken at the beginning or end of the regularly scheduled shift depending on the staffing requirements and /or exigent circumstances (as determined by a Shift Commander or Captain) encountered on that particular day.

**ARTICLE XVII, Shifts & Shift Differentials**

*Section 1.* Employees shall work on the shift, shifts or shift assignments for which they were employed or have been subsequently assigned to as a result of seniority bidding.

*Section 2.*

(a) The University may make reassignments for new employees in their probationary period up to two (2) times per year.

(b) No employee (in "a" above) may be reassigned more than one (1) time per year.

(c) Prior to reassignment, the Division of Public Safety will consider the request of volunteers for reassignment.

(d) Prior to reassignment, the Division of Public Safety would give affected employees thirty (30) days' notice.

(e) Differential pay shall cease for assignments today Special Services and day bike patrol. Employees currently performing these duties shall be "red circled."

*Section 3.* The Employer shall have the right to assign any employee to any shift for a thirty (30) day temporary period subject to the limitations stated in Section 1 of this Article, if the Employer, in its sole discretion, considers such assignment to be required for the efficient operation of the Employer's organization. When shift change affects an employee receiving shift differential pay, the employee will continue to receive said differential during the temporary shift change.

*Section 4.* An employee who is scheduled to work a shift, and the majority of shift hours fall within the period between 3:00 P.M. and 7:00 A.M., shall receive a ten percent (10%) shift differential for all hours worked. Sick leave shall not be considered as time worked.

## ARTICLE XVIII, Health, Welfare and Education

*Section 1.* For employees who are required to, or who choose to participate in any of the health care coverage options provided at the University, any premium cost will be paid by the employee in accordance with the then current University payment schedule.

For employees covered by this labor Agreement, the University shall pay the full premium cost for employees enrolled in the Group Life Insurance Plan.

*Section 2.*

(a) The University and the PPA agree that all of the terms and provisions of the Group Life Insurance Plan, the Long Term Disability Income Plan for University personnel and the Employee Retirement Allowance Plan shall be and hereby are incorporated herein by referenced as fully as though expressly set forth herein, and that the parties hereto shall be bound thereby.

(b) The University's modified medical retiree benefit plan design, as may be redefined, is applicable to the

members of the bargaining unit effective June 30, 1996. The parties agree to meet and discuss the implementation of this program.

*Section 3.* The University agrees that during the term of this Agreement any changes made in the benefits plans mentioned in Sections 1 and 2 above shall be made immediately available to the employees in this bargaining unit.

*Section 4.*

(a) Employees and their dependents, where applicable, shall be eligible to participate in the Faculty and Staff Scholarship Program in accordance with the provisions thereof, as may be amended from time to time by the University.

(b) Any officer who receives over $500 worth of occupational training/education is responsible for reimbursement to the Department if he/she voluntarily terminates from the Department within twelve (12) months of the said training being completed.

*Section 5.*

(a) The University shall continue to make reasonable provisions for the safety and health of its employees during the hours of their employment. Protective devices, weapons, and wearing apparel and other equipment necessary for the protection of employees shall be provided by the University, including the providing and maintaining of uniforms and supplying of boots, rubbers, and winter caps. In the event a University Police Officer should provide his/her own equipment, such equipment must meet the standards for that type of equipment set by the University Police Department.

(b) The Employer shall provide, without cost, a bullet proof

vest to all bargaining unit members. Bargaining unit members shall be required to wear such vests at all times during the workday. Employees on special details may be exempt from this requirement by the order of the Chief of Police, or designee. The Employer shall determine the type of vest to be purchased. Vests will be replaced when needed according to the manufacturer's specifications. If a carrier is needed, the employee is responsible for replacement.

Effective August 1, 2024, the Employer shall provide a eight hundred dollar ($800.00) annual clothing allowance per officer for the selection of Department authorized equipment. Effective August 1, 2025 the Employer shall provide a nine hundred dollar ($900.00) annual clothing allowance per officer for the selection of Department authorized equipment. Effective August 1, 2017 Three hundred and fifty ($350) dollars of this amount may be dispersed in accordance with current practice when requested by an employee directly to all uniformed officers who were hired prior to August 1, 2005. Effective August 1, 2018 Two hundred and fifty ($250) dollars of this amount may be dispersed in accordance with current practice when requested by an employee directly to all uniformed officers who were hired prior to August 1, 2005. Effective August 1, 2019 Two hundred and fifty ($250) dollars of this amount may be dispersed in accordance with current practice when requested by an employee directly to all uniformed officers who were hired prior to August 1, 2005. Uniformed officers hired after this date cannot receive a cash disbursement until they have completed three (3) years of service. For those employees not in uniform, the Employer shall provide the annual clothing budget by check after one full year in the non-uniform assignment.

(c) A committee of equal representation shall be formed to review and select the uniform vendor(s) who meet the Department's standards. The new procurement system

is intended to allow the employees to obtain their uniforms and equipment within the rules established by the committee.

(e) The Employer shall replace Department issued equipment destroyed during a police action without charge. However, if the officers were negligent, they will be held accountable for reimbursement to the Department for the value of the missing, lost, or stolen item(s).

**(d)** For those employees not in uniform, the Employer shall provide maintenance of non-uniform business attire for up to twenty-five (25) pieces per month.

(e) For those employees not in uniforms (Detectives), the employer shall provide a pre-paid credit card to a pre-selected retailer to be used to buy and maintain non-uniform business attire-subject to normal withholdings.

*Section 6.* Police Officers shall be permitted, in accordance with University policy, to participate in the University's supplemental retirement plans.

*Section 7.*

(a) In the event of violent death resulting from interpersonal physical violence in the line of duty, the beneficiaries of those employees currently in the bargaining unit shall receive a sum of three hundred and fifty thousand dollars ($350,000).

(b) In the event of violent death resulting from interpersonal physical violence in the line of duty, without regard to length of service, the college education of the Officer's surviving child(ren) will be provided in accordance with the specifications of Section 4 (a) of this article.

(c) Upon the death of any regularly employed Officer of the

University of Pennsylvania Police Department, the University shall, as expeditiously as possible, pay to the surviving spouse, if any, all pay that had, to the date of death, accrued to said deceased Officer by virtue of regular, special and differential pays, and unused and accrued vacation time. Payment shall be made by check, directly to, and in the name of, the surviving spouse.

In the event there is not a surviving spouse, payment shall be made to the estate of the deceased, as prescribed by law.

*Section 8.* The University of Pennsylvania will provide up to a maximum of four (4) weeks of paid parental leave to eligible employees following the birth of an employee's child or the placement of a child with an employee in connection with adoption in accordance to the University's Paid Parental Leave Policy.

*Section 9.* The members of this bargaining unit are subject to the provisions of the Employer's procurement, disbursement, travel, and entertainment policies, as may be amended from time to time by the University.

## ARTICLE XIX, Layoff and Recall

*Section 1.* In the event of reductions in force affecting the members, a 30-day written notice shall be posted or given to affected members. Members shall be laid off in the reverse order of their bargaining unit seniority, provided that the remaining employees are reasonably capable of performing the work of the Department. Employees who were laid off shall be recalled in the inverse order from which they were laid off, provided that they are reasonably capable of performing the job to which they are to be assigned. Three (3) bargaining unit members, who are officials of the PPA identified by the President in writing by January 15 of each year and forwarded

to the Office of the Chief of Police, shall be exempted from the layoff provisions of this Article.

*Section 2.* A person being recalled to work after layoff, if due to a reduction in force, shall be notified by registered mail, return receipt requested. A copy of such notice shall be mailed to the PPA. The notice shall be sent to the most recent address recorded in the University's files. If the University does not receive a reply to said letter from the person within ten (10) calendar days from the date of the recall letter and if the person does not report for work within fifteen (15) calendar days from the date of the recall letter, in either event the person will be considered to have forfeited all recall or rehiring rights.

*Section 3.* The forfeiture of recall rights shall not apply to persons who are unable to return to work within fifteen (15) calendar days due to a certifiable, temporary medical condition so long as the person notifies the University within ten (10) days from the date of the recall letter. In the event the recalled employee cannot return within fifteen (15) calendar days, the University reserves the right to recall the next senior employee(s).

**ARTICLE XX, Sick Leave**

Section 1. Regular full-time employees shall earn paid sick leave at the rate of one (1) day per completed month of service up to twelve (12) days in each fiscal year (July 1 - June 30). The maximum sick leave accumulation is twenty-four (24) working days. Employees who currently have more than twenty-four (24) sick days will not lose those days unless they use them in accordance with Section 7 of this Article. Those employees who fall below twenty-four (24) sick days will begin to accrue sick days. Unaccrued sick leave may not be advanced.

*Section 2.* To be eligible for sick leave pay, an employee who is absent must notify the Department not later than two (2) hours before the start of his regularly scheduled work day unless an excuse satisfactory to the Employer is presented for such failure to give such notice. All callouts must be made to the PennComm Police Supervisor at 215-898-9441. The Employer may require written certification by a healthcare provider or other proof of illness. In cases of a pattern of absence, the employee will be notified of the pattern, and a medical certificate may be required for a subsequent absence. Any employee in sick abuse status may be sick checked Employees will be given a letter of warning if they are about to lapse in sick abuse status. Employees in sick abuse status are subject to sick checks via telephone or personal visits from an on-duty UPPD Supervisor or Police Supervisor within the local jurisdiction in which the officer is convalescing.

In cases of an absence of four (4) or more workdays, a medical certificate will be required, it being understood that the Employer's implementation of this provision will not be arbitrary. Employees who have been on sick leave may be required by the Employer to undergo a medical examination to determine fitness for duty before being permitted to return to duty. Such examination, if required, shall be at the Employer's expense.

*Section 3.* Sick leave for eligible employees may be utilized for illness of the employee, for illness of a member of the employee's household (up to three (3) days per fiscal year) and for doctor/dentist appointments when it is not possible to schedule such during non-working hours.

*Section 4.*
The employer may require written certification by a healthcare provider. In cases of pattern of absence (three or more types of sick leave undocumented by a medical certificate in any 12 month period that establish a recognizable pattern as determined by the department), the employee will be notified of

the pattern (i.e., calling out sick on the same day of the week, calling out sick before or after days off, calling out on weekends, taking one sick day a month, etc.), and a medical certification will be required for subsequent absence. Employees will be required to bring in medical certification under the following conditions:

- Employee is in discipline status and advised as such in writing.
- Medical certification for taking a Family Sick Day must include specific indication of the family member and any medical appointment if in Sick Abuse Status.
- Absence of 4 or more days
- Absence for a time previously denied as vacation, personal or any other applicable paid leave
- Employee reports off sick in any "Restricted Day," severe weather, and/or other exigent circumstances if in Sick abuse Status.
- Documentation will be required if an officer calls off Sick for a required court attendance if in Sick Abuse Status. [For example, call off sick for court on Tuesday morning and then report for work at 2:30pm on that day.

*Section 5.*

(a) Whenever an employee is absent from work as a result of an injury or sickness compensable under the Workers' Compensation Act, the Occupational Disease Act, or similar legislation, the employee shall have the right to apply for and receive his/her unused sick leave allowances during the waiting period, if any, and thereafter the difference between the weekly amount of such compensation and his regular straight time rate of pay for a regularly scheduled work week, until he has exhausted the full amount of his sick leave allowance
.

(b) Absences for the initial first and second 5-workday periods due to an occupational injury will be covered by the Department if the doctor's note and/or the

University's designated Workers' Compensation Third Party Administrator validate the injury and the need for the absence during the initial period.

*Section 6.* Pay for any day of sick leave shall be at the employee's regular rate of pay, as defined in this Agreement.

*Section 7.* Short Term Disability:

PPA 113 members shall be eligible to participate in the University's Short-Term Disability Plan and be covered under the University's Paid Parental Leave Plan under the same terms and conditions as other University employees.

The University and the Union agree that all of the terms and provisions of the Short-Term Disability ("STD") plan and Paid Parental Leave (PPL) plan will become effective on or about August 1, 2023. Employees who have STD days accrued as of August 1, 2023, will keep those days until July 30, 2025. These days will be used to substitute 100% of pay for 75% of pay during weeks 9 through 26 of an approved STD leave. Bargaining unit employees shall be and hereby are incorporated herein by reference as fully as though expressly set out herein, and that the parties hereto shall be bound thereby; provided, however, that except as written below, the University agrees that during the term of this Agreement, it will not without the knowledge and consent of the Union, modify, suspend, or discontinue any the Plan insofar as they affect employees covered by this Agreement. Notwithstanding the foregoing, the University may, without the knowledge or consent of the Union, take any action with respect to the Plan (including, without limitation, amendment of the Plan) that:

i. is necessary to maintain the Plan's compliance with applicable law, or
ii. applies to all University employees covered

under the Plan and relates to the general administration of the Plan or the method of delivering benefits under the Plan, provided that such action does not affect the type or amount of the benefits provided under the Plan.

**ARTICLE XXI, Bereavement Leave**

*Section 1.* Employees shall be entitled to bereavement leave as follows, provided the employee's supervisor is informed:

(a) An employee shall have the right to use up to one (1) week of administrative leave at his/her regular rate of pay in the event of the death of a spouse, child, parent, parent-in-law, brother, sister, brother-in-law, sister-in-law, legal guardian who served in the role of parent, or registered same sex domestic partner (in accordance with University Policy)

(b) An employee shall have the right to use up to three (3) work days of administrative leave at his/her regular rate of pay in the event of the death of a grandparent , grandchild, aunt or uncle of the employee or employee's spouse.

(c) An employee shall have the right to use one (1) day of administrative leave at his/her regular rate of pay in the event of the death of a, niece/nephew, or a blood related first cousin.

*Section 2.* In the event of a death covered by Section 1 of this Article and the employee is absent on vacation with pay, absence because of the death shall be in addition to and not part of the vacation. Proof of death in the family may be required before leave with pay is granted.

**ARTICLE XXII, Paid Time Off**

*Section 1.* All employees shall be granted Paid Time Off on the basis of University seniority. Paid Time Off allotment shall be computed on a monthly basis to the following schedule:

(a) Employees who have completed less than two (2) years of service will accrue 1.250 days per month.

(b) Employees who have completed two (2) year of service will accrue 1.417 days per month.

(c) Employees who have completed three (3) years of service will accrue 1.583 days per month.

(d) Employees who have completed four (4) years of service will accrue 1.750 days per month.

(d) Employees who have completed five (5) years of service will accrue 2.000 days per month.

(e) Employees who have completed twenty-five (25) years of service will accrue 2.166 days per month.

*Section 2.* An employee who has accumulated six (6) months or more of service during the said twelve (12) month period ending June 30, and who thereafter separates or is separated from the service of the University for any reason other than discharge for cause, shall receive upon separation the vacation pay earned by him/her to date of the separation, and if reinstated shall also be entitled to receive any vacation with pay earned by him/her subsequent to his reinstatement, but will not be granted vacation pay for or during the time he is not actually working for the University.

*Section 3.* In computing years of service for Paid Time Off purposes, those who started work between the 1 and 15 of a month shall be credited with the full month; for those who started work the 16th or later, credit shall begin on the first of

the next month.

*Section 4.* Paid Time Off (PTO) accrued cannot exceed thirty-five (35) days.

*Section 5.* Paid Time Off requests of five (5) workdays within the work week of Monday through Sunday shall take precedence over vacation requests of less than five (5) days. Paid Time Off requests covering the same or similar period of time and requiring that a choice be made as to whose vacation request can be approved or denied, will be evaluated on the basis of bargaining unit seniority. Paid Time Off requests of 5 or more working days require two weeks advance notice and vacation requests of less than 5 days require at least 3 working days advanced notice.

*Section 6.* Paid Time Off requests for each vacation year will be submitted during the period of April 1 to April 15. Each employee will be given the opportunity to select, in seniority order, up to two (2) weeks of Paid Time Off for the period May 1 to April 30. Once an employee's Paid Time Off has been approved, it will not be changed because of the exercise of seniority at a later date.

*Section 7.* Seniority can only be invoked once per 12-month period for vacation/paid time-off requests for periods of five (5) consecutive days or more.

## ARTICLE XXIII, Personal Days

(Eliminated See Prior Article on Paid Time Off)

## ARTICLE XXIV, Holidays

*Section 1.*

For all employees the following holidays will be observed on their actual day of occurrence (e.g. Christmas day falls on a Sunday 12/25 however, the University observes the holiday on Monday 12/26. Employees will observe the holiday on the

actual date of the holiday which is Sunday 12/25): New Year's Day, Martin Luther King Day, Easter Sunday, Memorial Day, Juneteenth, Independence Day, Labor Day, Thanksgiving Day and the following Friday, Christmas Day, the scheduled work day preceding Christmas Day and the scheduled work day preceding New Year's Day.

*Section 2.* An employee who works on a holiday will receive holiday pay plus one and one-half (1½) his/her regular straight time rate of pay for all hours worked on such holiday. The holiday or the day on which the holiday is observed shall be the calendar day and shall be the twenty-four-hour period beginning at the shift changing time nearest to 12:01 A.M. of the holiday or the day observed.

*Section 3.* When a holiday falls on an employee's regularly scheduled day off, the employee may notify the Department to receive compensatory time off within ninety (90) calendar days with such time approved by the Department in accordance with the operational needs dictated by the academic calendar. If the employee elects to receive a compensatory day the employee will not be paid for the holiday. Such notification shall be required seven (7) calendar days or more before the holiday.

*Section 4.* In order to be eligible for holiday pay as provided herein, an employee must work on the last regularly scheduled work day preceding and the next regularly scheduled work day immediately following the holiday unless the absence is certified by the Chief of Police, or his/her designee, as due to sickness or accident, funeral leave, jury duty, vacation or personal day. In addition, an employee who is scheduled to work a holiday and does not report for work shall not receive any holiday pay unless the reason for not reporting to work is approved by the Chief of Police.

*Section 5.* An employee in the bargaining unit shall receive three (3) days of administrative leave for the special Winter

vacation. The leave scheduled pursuant to this section must be taken during the period as announced annually by the Chief of Police, in accordance with operational needs dictated by the academic calendar. Such announcement will be made not later than November 1 of each year. Employees in the bargaining unit will be eligible for the provisions of this section, after successfully completing their introductory probation period.

**ARTICLE XXV, Military Leave**

*Section 1.* An employee who is a member of the National Guard or a reserve component of the U.S. Armed Forces will be granted time off with pay for annual military duty provided the duty is obligatory to maintain military status. The maximum paid time allowed for annual duty is ten (10) workdays per fiscal year (July 1 -June 30). The request for time off must be presented to the immediate supervisor at least fourteen (14) calendar days under normal circumstances, in advance of the effective date of the temporary duty. The request must contain the date of departure, the date of return and a copy of the official military orders.

*Section 2.* During the period of absence referenced in Section 1 of this Article, the University will pay the difference if the military pay is less than the employee's university pay. For purposes of this section, military pay includes base pay, allowance for longevity, subsistence, quarters, and dependents, plus pay for sea, flight, foreign and hazardous duty. Employees will continue to be eligible for the benefits provided under the terms of the University's Policy #611-Military Leave.

**ARTICLE XXVI, Discipline and Discharge**

*Section 1.* The Employer shall have the right to discharge, suspend, or discipline any employee for just cause.

*Section 2.* The normal progressive disciplinary procedure for employees who have completed their probationary period shall be oral warning, written warning, and suspension from work without pay up to a maximum of ten (10) working days and discharge. However, the University may, depending upon the severity of the action on the part of the employee(s), begin the discipline at any step of the disciplinary procedure including discharge.

*Section 3.*

(a) The Employer shall have the right to place an employee on administrative leave an employee pending the outcome of an investigation into allegations of misconduct. In such cases, the administrative leave shall be with pay and continuation of benefits, except when arrested by a police agency for a felony. The Employer, during such administrative leave, may assign said employee to administrative duty at its discretion.

(b) When it becomes necessary to remove an officer from his/her assigned duties, a letter will be provided with a brief written statement within 24 hours of the removal setting forth the reason(s) for the removal.

(c) An employee who is being placed on administrative leave pending an investigation will be furnished with a brief written statement setting forth the reason(s) for imposing the administrative leave. The statement will be provided the employee at the time of administrative leave or within twenty-four (24) hours thereafter. A copy will be forwarded to the PPA representative. The written statement furnished the employee pursuant to this section shall in no way limit management's rights, including the right to use additional information not contained in the statement to the employee to determine the appropriate disciplinary action if any.

*Section 4.* In instances where the Employer intends to suspend without pay or terminate the employment of an employee pursuant to Section 1 of this Article, the employee will be given the opportunity to have a pre-disciplinary hearing before the Chief of Police, or his/her designee. Such hearing shall be held not later than three (3) business days of writing a notice of intent to suspend without pay or terminate the employment.

The Employer shall present the basis for the disciplinary action and the employee, at his option, may respond to such charges indicating why the intended action is not appropriate. Upon conclusion of the hearing, the Chief of Police, or designee, will make the final decision regarding the disciplinary action and issue the same in writing to the employee and his/her representatives.

*Section 5.* The Employer will notify the PPA in writing of any discharge or suspension within three (3) working days from the time of discharge or suspension. If the PPA desires to contest the discharge or suspension, it shall give written notice thereof to the Employer within fourteen (14) calendar days from the date of receipt of notice of discharge or suspension. In such event, the dispute shall be submitted and determined under the grievance and arbitration procedures contained in this Agreement, commencing at Step 3 of the grievance machinery.

*Section 6.* If the last day for doing any act called for by this Article falls on a Saturday, Sunday or holiday, as such holiday is defined in this Agreement, compliance with such requirement on the next succeeding day shall be considered full adherence to this Agreement.

*Section 7.* In the case of an Oral Warning, an employee who goes for a period of 180 days (six months) without receiving another official warning will have their warning removed from their file as consideration for a future level of discipline. In

cases of a Written Warnings the reckoning period will be 270 days (nine months), and suspensions will have a reckoning period of 12 months. The discipline procedure regarding "Absenteeism/ Tardiness" will remain the same as it has been in the past. The reckoning period is 12 months no matter what the discipline steps the employee is at in the process.

*Section 8.* Officers in disciplinary status of "Written" or above are not eligible for a shift change or transfer to another unit for the duration (reckoning period) of their discipli

**ARTICLE XXVII, Grievance Procedure**

*Section 1.* A grievance shall be defined as any dispute between the parties hereto concerning the interpretation, application, performance, or any alleged breach of any provision of this Agreement, and shall be processed and disposed of in the following manner:

Step 1 Within thirty (30) calendar days of the occurrence or knowledge of the event complained of, an employee having a grievance or the PPA shall present such grievance orally to his supervisor. The date of filing of the grievance shall be recorded on a form the content of which shall be mutually agreed upon by the Employer and the PPA. The Employer shall give its answer to the employee and the PPA within seven (7) calendar days after the presentation of such grievance. If a business representative notifies the Employer that he wishes to participate in Step 1, the grievance shall be immediately considered at Step 2 and processed in accordance with Step 2 procedures.

Step 2 If the grievance is not settled in Step 1, the grievance may, within seven (7) calendar days after the answer in Step 1, be presented in Step 2. A grievance shall be presented in this step, by the aggrieved employee and his/her PPA and/or business representative, to the Chief of Police, or his/her designee.

The PPA and/or business representative within seven (7) days after the Step 2 grievance is filed may request a Step 2 meeting. If such request is made, the Police Department management shall, within seven (7) days after such request arrange a meeting to include the employee, and his representative(s) from the PPA with the Chief of Police or his designee, and other representatives of the Department as required. At this meeting either party may call necessary witnesses or present any record pertinent to a discussion of the grievance. The Chief of Police or his designee shall

respond in writing within fourteen (14) calendar days of the date of Step 2 meeting.

Step 3 If the matter is not adjusted at Step 2, the grievant, and his PPA and/or business representative from the PPA may within fourteen (14) calendar days of the date of the Step 2 response request a meeting with the Director of Staff and Labor Relations, or designee. If such a request is made, the University shall within seven (7) calendar days arrange a meeting to include the employee, the PPA and/or business representatives from the PPA and representatives of the University. At this meeting, either party may call necessary witness or present any record pertinent to a discussion of the grievance. The Director of Staff and Labor Relations, or designee, shall within fourteen (14) calendar days respond in writing to the President of the PPA or designee.

*Section 2.* Failure on the part of the Employer to answer a grievance at any step shall not be deemed acquiescence thereto, and the PPA may proceed to the next step.

Anything to the contrary herein notwithstanding, a grievance concerning a discharge or suspension may be presented initially at Step 3 in the first instance, within fourteen (14) calendar days from the date of receipt of notice of discharge or suspension.

*Section 3.* If the last day for doing any act called for by this Article falls on a Saturday, Sunday or holiday, as such holiday is defined in this Agreement, compliance with such requirement on the next succeeding day shall be considered full adherence to this Agreement.

*Section 4.* A grievance which affects a substantial number or class of employees (3 or more), and which the Employer representative designated in Step 1 lacks authority to settle, may initially be presented at Step 2 by the business

representative. Such grievances shall be presented within thirty (30) calendar days of the occurrence or knowledge of the event or events complained of. This time limitation may be waived by mutual agreement between the Employer and the PPA.

*Section 5.* All grievances shall be presented within the time limitations contained herein or they shall be considered waived. Unless a grievance is appealed within the time limitations contained herein after the Employer's answer in each step, such grievance shall be conclusively deemed to have been settled in accordance with such answer. Such answer shall be final and binding upon the aggrieved employee(s) and the PPA.

*Section 6.* Management will make a reasonable effort to consider the work schedule of the employee in setting hearing dates and times.

**ARTICLE XXVIII, Arbitration**

*Section 1.* Any grievance concerning the interpretation, application or alleged breach of any specific provision of this Agreement that has been properly processed through the grievance procedure as set forth in this Agreement and has not been settled at the conclusion thereof may be taken to arbitration by the PPA by serving written notice thereof within fourteen (14) calendar days after the Employer's answer at Step 3 of the said grievance procedure. Within fourteen (14) calendar days after having served such written notice, the PPA shall file a formal demand for arbitration. Such demand shall be filed with the American Arbitration Association at its Philadelphia office and any arbitration resulting from such demand shall be held at such place as may be designated by such office. If the PPA fails to serve such notice on the Employer or to file such demand for arbitration within these time limitations, it shall be deemed to have waived the arbitration and the grievance shall be considered settled. No

individual employee shall have the right to invoke this arbitration procedure. The time limitations set forth herein may be waived by mutual agreement between the Employer and the PPA.

*Section 2.* The jurisdiction and authority of the arbitrator and his opinion and award shall be confined exclusively to the specific provision or provisions of this Agreement at issue between the PPA and the Employer. He/she shall have no authority to add to, alter, amend, or modify any provision of this Agreement, including any Appendix hereto. The written award of the arbitrator, if within the jurisdiction and authority as specified in this Agreement, shall be final and binding upon the aggrieved employee(s), the PPA and the Employer.

*Section 3.* The PPA and the Employer shall each bear its own expenses in these arbitration procedures, except that they shall share equally the cost of transcript, fees, and other expenses of the arbitrator in connection with the grievance submitted to him/her.

**ARTICLE XXIX, Pension**

*Section 1.* Pension for employees in the bargaining unit is created by a Memorandum of Agreement to this Agreement.

Section 2. The University will contribute up to a maximum of 7% per annum of the Bargaining Unit's base salary to assist in the funding of the Police Pension Fund. This is in addition to the current contribution of $1.10 per hour. This new contribution is to be made on the condition(s) that:

- The Union is fully aware that these contributions are only for the term of this contract and may not be continued under subsequent bargaining units.
- The Union's membership will increase their contributions to the Police Pension Fund up to a maximum of 3.0%, up from 2.0%, of their base pay

upon the implementation of this bargaining agreement. This minimum level of contribution must be maintained by the members/employees for the term of this bargaining agreement.

- The Police Pension Fund Trustee will determine how much and when the per annum amount from the University needs to contribute to the Fund. The Trustees will make any notification of payment and the amount to the Vice President of Public Safety in writing.

***Section 3.*** The University agrees that once a member of the bargaining unit reaches the maximum years of participation credit (25) in the Penn Police Pension Plan, that employee will be permitted to move over voluntarily to the University's TDR Benefit Plan. The Penn Police Pension benefit will be frozen at that point in time, and the employee will be able to transfer without penalty and participate under the existing rules of the TDR Plan. This practice will begin no later than January 1, 2012.

**ARTICLE XXX, Separability**

All agreements herein made are subject to all applicable laws now in effect or hereafter to come into effect, and to the lawful regulations, rulings and orders of regulatory commissions or agencies having jurisdiction. If any provision of this Agreement is in contravention thereof during the life of this Agreement, such provision shall be superseded by the appropriate provisions of such law or regulation, so long as such law or regulation remains in force and effect. All other provisions of this Agreement not affected thereby shall continue in full force and effect.

**ARTICLE XXXI, Integration Agreement**

This Agreement contains the complete contract between the Employer, the PPA and the employees with respect to rates of

pay, wages, hours, and other conditions of employment, and can only be added to, detracted from, altered, amended or modified by a document in writing, signed on behalf of the parties hereto by their duly authorized officers or representatives.

ARTICLE XXXII, Posting and Promotion

All promotional opportunities (including Detectives shall be posted on a bulletin board. The posting shall include a brief assignment description, qualifications, and testing procedures.

**ARTICLE XXXIII, Effective Date and Duration**

This agreement shall be in full force and effect for the period commencing **August 1, 2023 and** ending 12:01 A.M. **July 31, 2026**. Should the parties agree to negotiate a new Agreement, neither party may notify the other in writing of its demand to negotiate at least ninety (90) days before, but not later than thirty (30) days before the expiration date. Upon the giving of such notice by either party, the parties hereto shall meet for the purpose of negotiating a new Agreement.

IN WITNESS WHEREOF, the PPA and the Employer have executed this Agreement this 4th **day of October 2023.**

| For: The Trustees of the University of Pennsylvania | For: The Fraternal Order of Police, PPA 113 |
|---|---|
| John J. Heuer<br>Vice President<br>Human Resources | |
| Jeffrey S. Rowland<br>Jeffrey Rowland<br>Executive Director | Eric Rohrback<br>President |
| William Melleby<br>Division of Public Safety | Jason Squadroni<br>Recording Secretary |
| Cpt. Michael Belisairo<br>Division of Public Safety | |

## UNDERSTANDINGS

**Understanding A:**

Special Duty Selection: Management will consult with the bargaining unit to establish processes for selection to Special Duty assignments.

**Understanding B:**

Re-employment Consideration: If a bargaining unit position is to be posted and filled, Police Officers who have resigned, in good standing without active discipline, will be given fair consideration for re-employment. The individual must be eligible for recommissioning0, capable of performing the work, and the period of separation does not exceed one (1) year.

**Understanding C:**

Reduced Hour Work Scheduling:

*Section 1.* The University of Pennsylvania Police Department and the Penn Police Association acknowledge that circumstances may exist which would warrant a reduced hour work schedule for an already employed University Police Officer.

*Section 2.* If an already employed University Police Officer encounters a domestic or personal situation, with extenuating circumstances, which absolutely necessitates a temporary reduced hour work schedule, that Police Officer may request the PPA for approval for such assignment.

*Section 3.* To be eligible for consideration of assignment to a reduced hour work schedule, an applicant must have served the University as a full time Police Officer for a minimum of twelve months, exclusive of entry-level police academy training. In addition, the Police Officer must have successfully completed his/her probationary period.

*Section 4.* If approved by the PPA, the Officer may petition the Chief of Police's office for consideration of assignment. The Chief of Police will review the Police Officer's application in good faith and determine if the Officer's request is legitimate and absolutely necessary. The Chief of Police may approve or deny the request. The Chief of Police will not be arbitrary or capricious in making this decision.

*Section 5.* Any reduced hour work schedule granted must be considered temporary. However, a deadline for the scheduling arrangement may or may not be imposed and under no circumstances will the reduced hour work schedule exceed a twelve-month duration without the review and concurrence of both the Chief of Police and the PPA.

*Section 6.* A maximum of four (4) University Police Officers may be assigned to work reduced hour work schedules at any given time.

*Section 7.* A Police Officer assigned a reduced hour work schedule may work no more than twenty (20) hours per week.

*Section 8.* The decision to approve or deny such a request is solely that of the Chief of Police. The decision to approve or deny the request cannot be grieved by the requestor or the Penn Police Association.

*Section 9.* Any reduced hour work schedule shall not in any way change the definition of a "regular work week" as defined in Article XIII, Sections 1 and 2 of the collective bargaining agreement. A regular work week shall continue to be forty hours within the period of Monday through Sunday. Any reduced hour work schedule shall be a temporary accommodation to meet a specific and legitimate need of an already employed University Police Officer.

*Section 10.* Under no circumstance will the University nor the University of Pennsylvania's Division of Public Safety hire a Police Officer or Police Officer candidate who will be scheduled to work less than forty hours in any seven-day period for any reason other than those specifically provided for in the collective bargaining agreement, including this appendix.

*Section 11.* The University Police Officer assigned to reduced hour work status shall be covered by all terms and conditions of the collective bargaining agreement between the Penn Police Association and the Trustees of the University of Pennsylvania except:

1. Article XIII, Working Hours, Sections 1, 2 and 3
2. Article XV, Overtime, Sections 1, 2 and 3
3. Article XVIII, Health, Welfare and Education, Sections 1, 2, 4 and 5
    a. Employees are eligible for group rates for health insurance. The entire premium is paid by the Police Officer.
    b. Employee are eligible for group rates for life insurance. The entire premium is paid by the Police Officer.
4. Article XX, Sick Leave, Section 1 and 4
    a. Section 1. Employees are eligible for sick leave on a pro-rated basis.
5. Article XXI, Bereavement Leave
    a. Employees are eligible on a pro-rated basis.
6. Article XXII, Vacations
    a. Employees are eligible on a pro-rated basis
7. Article XXIII, Personal Days
8. Article XXIV, Holidays
9. Article XXIX, Pension

**Understanding D:**
Exchanging Assignments: Employees may request to "switch" days off with another member under the following conditions: the decision is at the sole discretion of the supervisor, such action is within the shift of the affected employees, such action is within the same pay period, the "switch" does not result in overtime or other increased cost.

**Understanding E:**
Labor Management Committee(s): Labor/management committee(s) may be established to discuss issues of mutual concern. It is understood that the committee(s) are advisory in nature and the University and Union reserve their rights.

**Understanding F:**
Work Schedules: The parties agree they will meet to discuss and review alternative work scheduling practices. These discussions will begin prior to January 1, 2012. The first alternative to be reviewed will be the Four/Ten Hour Day work schedule.

**Understanding G:**
Overtime Assignments: The parties agree to meet and discuss how overtime assignments can be offered and staffed in a more acceptable and efficient manner.

**Understanding H:**
Working Hours: The University shall remove the word pilot from the CBA concerning 10 hour shifts and adjust all applicable Articles affected by going to 10 hour shifts with an understanding that management reserves the right to return to eight (8) hour shifts and adjust all applicable Articles affected by returning to eight (8) hour shifts as outlined in the Collective Bargaining Agreement with a bona fide business need and with proper fifteen (15) day notice.

**Understanding I:**

Pension: Within ninety (90) days of ratification the University and PPA will meet with a team from both parties to form a pension committee and discuss and study the pension plan.

**Understanding J:**

Officers should be permitted to view camera footage for writing of reports, court preparation, internal investigations, and civil depositions. The purpose of this section is to provide police officers with the knowledge that first offense, minor disciplinary infractions that are captured on anybody worn camera will not result in an official internal investigation based solely upon this first offense minor infraction. Digital recordings from body worn cameras shall not be randomly reviewed for the sole purpose of finding disciplinary infractions.

**Understanding K:**

Effective for employees who retire or otherwise terminate employment on or after August 1, 2017, compensation used to calculate such an employee's pension benefit shall be based on (1) an employee's base annual rate of pay as in effect August 1, 2017 and subsequent August 1 dates, and (2) the average compensation for the three years (the plan previously provided for five years) during the last 10 plan years that produce the highest average compensation.

# EXHIBIT B

# UNIVERSITY OF PENNSYLVANIA POLICE DEPARTMENT

# *Official Commendation Merit*

## *Police Officer Anthony Corrado*
## *Badge #107*

*You are to be commended for your actions on August 15, 2025.*

*On that date, at approximately 12:25am, Officers Tu and Brown were on patrol in the 3600 block of Chestnut Street when they were flagged down by a witness who stated that a male was being robbed by a group of males in the alley.*

*Upon arrival, the officers observed the group exiting the alley. Police Officers Brown and Tu stopped two of the males nearby at 36th and Ludlow as they fled, while broadcasting descriptions of the other fleeing suspects. Officers Hammond and Corrado stopped four of the males at 37th and Ludlow, while Officer Jones and Nawuoh observed and apprehended the final suspect in the 3700 block of Chestnut Street. Lt. Bittner was on scene and coordinated response efforts.*

*Upon investigation it was learned that the group of suspects had punched, kicked and urinated on the complainant, an unhoused individual, then stole $7 from his pocket. The complainant was transported to the hospital for treatment of his injuries, and the suspects were all positively identified and taken for processing.*

*These officers showed alertness, experience, good judgement and tactical awareness in apprehending these individuals. Thank you all for a great team effort!*

*Derrick E. Wood*
*Chief of Police, UPPD*
*Division of Public Safety*
*University of Pennsylvania*

# EXHIBIT C

Penn
UNIVERSITY of PENNSYLVANIA
DIVISION of PUBLIC SAFETY

UNIVERSITY OF PENNSYLVANIA POLICE
4040 CHESTNUT STREET
PHILADELPHIA, PA 19104
TELEPHONE: 215.898.4483
EMERGENCIES: 215.573.3333
http://www.publicsafety.upenn.edu

# MEMO

TO: POLICE OFFICER ANTHONY CORRADO #107

FROM: CHIEF OF POLICE DERRICK WOOD

CC: BELOW DISTRIBUTION

DATE: OCTOBER 7, 2025

SUBJECT: EXTENSION OF PROBATION

---

On April 7, 2025, your employment with the University of Pennsylvania Police Department commenced and you were placed on a six (6) month probationary period.

On September 27, 2025, you were involved in an auto vehicle accident while operating a University of Pennsylvania Police vehicle. The investigation is currently ongoing and cannot be completed until Officer Corrado returns from IOD status.

Based on the aforementioned information and pursuant to Article IX of the Collective Bargaining Agreement between The Penn Police Association and The Trustees of the University of Pennsylvania, your probationary period will be extended from six (6) to twelve (12) months. Your probationary period is now scheduled to end on **April 7, 2026**.

During this extended probationary period, you can be required to participate in several training sessions which will address deficiencies. Failure to satisfactorily complete these trainings or any additional violations of the UPPD Code of Conduct, UPPD Directives, or unsatisfactory performances may result in termination of employment at the University of Pennsylvania.

Agreed to and Acknowledged by:

Employee Signature ______________________________ Date ______________

PPA Representative ______________________________ Date ______________

Cc: Director Nathaniel Brouhard
DC Michael Belisairo
Captain Joseph Ferdman
Captain Christian VanDerVort
PPA
File

# EXHIBIT D

Penn
University of Pennsylvania
Division of Public Safety

University of Pennsylvania Police
4040 Chestnut Street
Philadelphia, PA 19104
Telephone: 215.898.4483
Emergencies: 215.573.3333
http://www.publicsafety.upenn.edu

# MEMO

TO: OFFICER ANTHONY CORRADO #107

FROM: CAPTAIN C. VANDERVORT

DATE: MARCH 3, 2026

SUBJECT: CONCLUSION; SAFETY REVIEW BOARD HEARING; 2026-01

## ORIGIN

On February 5, 2026, Lieutenant Andrew Malloy was assigned to conduct a Safety Review Board Hearing concerning your involvement in a motor vehicle accident on September 27, 2025. You were out of work due to an on-duty injury sustained as a result of the accident and were therefore unable to be interviewed.

The investigation determined that the collision was preventable and resulted from your failure to comply with departmental policies governing emergency vehicle operation, traffic signal compliance, and safe vehicle operation.

## CONCLUSION

The investigation revealed that you entered a controlled intersection against a steady red signal while traveling at a high rate of speed and failed to properly activate your emergency warning devices. The collision resulted in the total loss of a UPPD police vehicle and a civilian vehicle, damage to City property, and injuries that required you to miss work.

## RECOMMENDATION

After reviewing all evidence, including CCTV footage, you are found to be in violation of UPPD Directive 26, Routine and Emergency Vehicle Operation, specifically:

- Section IV(B)(1): Failure to activate all required emergency warning devices in accordance with Pennsylvania Vehicle Code §3105.
- Section IV(E)(1): Failure to operate the vehicle with due regard for the safety of all persons during emergency response.

As a result, you will remain on non-driving status until you have successfully completed a driver training course with Sergeant Bernard Donovan; this will be scheduled without delay.

Although your probation was previously extended following a preliminary review of this incident, the extended probationary period did not begin until your return to full duty on January 26, 2026. Your probationary period is now set to conclude on **July 26, 2026**.

# EXHIBIT E




Text messages between myself and Union president Joe McCauley

12:05

1/2

J

Joe Penn

Thu, Apr 9 at 5:55 PM

Sorry for coming off as a complete asshole I am just very frustrated by this situation.

Ok i understand thanks text that

I will talk to the dc tomorrow and try and get clarification on the situation, please understand that it's appeared that all this was going to be is an extended probation. I have seen situations like this before were cops got a lot more then just probation ! And try an remember you were on probation when this happened. So I text you tomorrow

I fully understand the situation. I accept being put on probation the first time for the accident. The accident happened on sept 27 2025. I was due to come off my first probation in early October 2025. I completed almost a full 6 months of probation with 0 issues then the accident happened. I now completed my second probation. I understand I was out 3 and a half months. Now I am being put on 3rd probation with 0 notice. I feel as though I have completed more than enough

iMessage

Confirmation of Joe not aware of March 3rd memo extending probation till July

12:07

J

Joe Penn

first time for the accident. The accident happened on sept 27 2025. I was due to come off my first probation in early October 2025. I completed almost a full 6 months of probation with 0 issues then the accident happened. I now completed my second probation. I understand I was out 3 and a half months. Now I am being put on 3rd probation with 0 notice. I feel as though I have completed more than enough probation time. To be on probation for a year and a half is crazy. They did things incorrectly. You received no notice of my new probation and neither did I. This is not right and should be challenged. There is no way this can stand with absolutely no notice to me or my union.

Being on probation also puts me in a bad position. I can be fired for any reason at anytime. Being off probation protects me and they have to follow proper steps to let me go if they decide to.

Again I understand! I didn't know about the probation till July
And I'll get clarification tomorrow

(c) Outside employment shall not be arbitrarily denied, but may be denied, with just cause, in writing within thirty (30) days.

iMessage

Confirmation of Joe not aware of the march 3rd memo extending probation till July.

1:31

J D

2 People

iMessage
Thu, Apr 9 at 8:44 PM

Joe Penn

Good evening! Chris and anthony ! It's becoming more and more clear to me that this probation situation need to be clarified
So tomorrow I am daywork I know Chris has court I will text the dc in the morning and see when a conference call can be done with you anthony and what time is good for you with the dc so that everything can be answered ! Hopefully everything can be answered and you can ask has many questions as you want to me a the dc ! Have a nice night be careful

Ok sounds good. Thank you!

Joe Penn

Yw !

Fri, Apr 10 at 11:08 AM

Any updates?

Joe Penn

Yes the dc is in meetings and will contact me after

Ok

iMessage

Confirmation of meeting being set up for April 10th




Confirmation of the DC knowing I asked to see my file




Confirmation of first grievance being handed in

# EXHIBIT F

copy

P/O Corrado Interview 05/05/2026

This interview is being conducted on 05/05/2026 at 21:16hours inside the Lieutenant's Office at the University of Pennsylvania Police Department Headquarters located at 4040 Chestnut St, Philadelphia, PA. The following are present:

- UPPD Lieutenant Michael R. Dougherty #15 **(MD)**
- UPPD Officer Anthony Corrado **(AC)**
- PPA Vice President Christopher Denshuick #117 **(CD)**
- UPPD Captain Joseph Ferdman #7 **(JF)**

**(MD)** – Officer Corrado, I am going to ask you a series of questions as they pertain to an Internal Investigation stemming from reported issues regarding your actions and conduct during the 2026 Penn Relays. Numerous infractions against the UPPD Code of Conduct were noted. Per the CBA, Article VII Section 4, you have the right, upon your request, to have a PPA representative present during this interview. Do you understand this right?
**(AC)** – Yes

**(MD)** – Given this right, you have requested PPA Vice President Denshuick to be your representative is this correct?
**(AC)** – Yes

**(MD)** – You were provided an Intent to Interview Notification on 04/27/26, which included the reasoning for the investigation, the right to request PPA representation during this interview, and the confirmation of CBA Article VII-Employee Rights section 5 that every effort will be made to complete this investigation within the 30-day period. Is this correct?
**(AC)** – Yes

**(MD)** – Article II of the UPPD Code of Conduct specifies that you must cooperate, be truthful, and make no attempts to deceive regarding material facts during any departmental investigation. Do you understand the rules as they are spelled out in the University of Pennsylvania Police Department Code of Conduct?
**(AC)** – Yes

AC
Initial

**(MD)** – Are you willing to answer questions related to your actions and conduct during the 2026 Penn Relays details?
**(AC)** – Yes

**(MD)** – Were you assigned to work the 2026 Penn Relays detail on Thursday, April 23 & Friday, April 24, 2026?
**(AC)** – Yes

---

Thursday, April 23, 2026

**(MD)** – What was your assigned post or responsibility on Thursday, April 23, 2026?
**(AC)** – I was assigned to Convention and South for the traffic detail.

**(MD)** – Prior to, or during the assignment, were you given any instructions regarding traffic control duties?
**(AC)** – Yes

**(MD)** – Who provided those instructions?
**(AC)** – Sergeant Weldon.

**(MD)** – What duties were you given regarding traffic control?
**(AC)** – Basically, to control the traffic. Make it is running smoothly, and make sure it ran the best it could, and to assist pedestrians in the cross walks.

**(MD)** – Did you understand that you were expected to actively assist with traffic control at that location?
**(AC)** – Yes

**(MD)** – Sergeant Weldon reported that he observed you standing on the sidewalk with your hands in your vest while the intersection and crosswalks were congested. Do you recall standing on the sidewalk during the assignment?

AC
Initial

**(AC)** – I was on the sidewalk waiting for people to cross at the crosswalk, yes.

**(MD)** – What were you doing while positioned on the sidewalk?
**(AC)** – So Berenstein was on side, positioned near where the train lets out. His side was extremely busy. We decided which cross walks we would be at. He was at one side, I was at the other. His section was way more busy than mine. He was crossing people, I was waiting for them to come to my side, and I would cross them.

**(MD)** – Did you observe congestion in the intersection, crosswalks, or roadway?
**(AC)** – Yes

**(MD)** – Did Sergeant Weldon instruct you to stand in the street and assist with traffic control?
**(AC)** – Yes

**(MD)** – How many times do you recall Sergeant Weldon giving you that instruction?
**(AC)** – Once

**(MD)** – Did you comply with Sergeant Weldon's direction? If yes, please explain what actions you took. If no, please explain why you did not comply.
**(AC)** – It's hard to give a yes or no for that. No. So the intersection was an absolute cluster. We had a traffic unit in the middle of the intersection that day. Berenstein was helping, I was helping. We each had a piece. Sergeant Weldon's instruction was to relieve the traffic controller from the intersection and to put me there. I had a judgment call that if I took over it would go back to being a cluster since it was running smoothly, so I did not.

**(MD)** – Did you tell Sergeant Weldon words to the effect of "I'm not a traffic guy"?
**(AC)** – No

**(MD)** – Were you assigned with P/O Bernstein at the traffic post?
**(AC)** – That's correct

**(MD)** – What was P/O Bernstein doing during the assignment? Did you observe P/O Bernstein actively directing traffic?

AC
Initial

**(AC)** – No. Berenstein was only crossing people at the crosswalk.

**(MD)** – Did anyone ask you to relieve P/O Berstein or give him a break?
**(AC)** – No

**(MD)** – Did you believe P/O Bernstein needed assistance?
**(AC)** – I think we all needed assistance. The intersection was an absolute disaster. I do not think just one person needed assistance. We had a major flow crossing, with people disobeying the lights. It was an absolute disaster. We needed a lot of help.

**(MD)** – What actions did you take to assist P/O Bernstein, if any at all?
**(AC)** – I was trying to do my thing, we kind of had our own little sections. He was crossing people, I was directing traffic, the traffic person was doing their thing. It was a team effort.

**(MD)** – Did Sergeant Weldon eventually relieve P/O Berstein and direct traffic himself?
**(AC)** – Yes

**(MD)** – What were you doing while Sergeant Weldon was directing traffic?
**(AC)** – I was helping him with one of the lanes of traffic.

**(MD)** – Did you observe Traffic Control Aides entering the roadway and directing traffic? What was your understanding of the role of the TCAs during the Penn Relays detail?
**(AC)** – Yes. The way that they relayed the message that they could do the traffic. Then later on, toward the end of the detail, we were told by one of the female aides that they were only allowed to cross people.

**(MD)** – Were you advised that TCAs were not permitted to direct vehicle traffic and were limited to pedestrian control?
**(AC)** – Yes, very late into the detail.

**(MD)** – Did Sergeant Weldon tell you that TCAs were in the roadway because you were not properly performing your assigned traffic control duties?
**(AC)** – No.

AC
Initial

**(MD)** – Did you make any attempt to take control of the intersection from the TCAs? If yes, what did you do? If not, why not?

**(AC)** – No. The way that we were running it was very smooth. They knew what they were doing, they had whistles. Removing them from the roadway would have caused an absolute cluster as it did once they left the roadway.

**(MD)** – Did you later tell Sergeant Ritterson that the TCAs "wouldn't let you do anything" or words to that effect?

**(AC)** – Words to that effect.

**(MD)** – What did you mean by that statement?

**(AC)** – The TCA, traffic control aides. They would direct the traffic and then we would enter the intersection. We kept going back and forth. They were instructed they couldn't do that but they kept repeatedly doing the traffic.

---

Friday, April 24, 2026

**(MD)** – What was your assigned post or responsibility on Friday, April 24, 2026?

**(AC)** – Convention and South.

**(MD)** – What were your scheduled tour hours?

**(AC)** – 6:30 to 12:30

**(MD)** – Did you leave your assigned post for a meal break?

**(AC)** – I did

**(MD)** – What time did you leave for the meal break?

**(AC)** – 11:38

**(MD)** – Before leaving for your meal break, did you notify a Sergeant?

**(AC)** – So with that situation, it was myself, Carr, and McKee. We were taking half hour breaks rotating. That whole day they knew I was leaving at 12:30. It was very well known. Carr was

sitting in ERT-1 with Sergeant Weldon. He said "Yo Corrado go to lunch". I thought at that time that came from Sergeant Weldon so I went to lunch.

**(MD)** – Did any supervisor approve your meal break?
**(AC)** – They did not.

**(MD)** – At the time you left for lunch, did you believe you were properly relieved from your assignment?
**(AC)** – Yes, because we were rotating so the intersection was completely covered. We had McKee, we had Carr, and ERT. We felt like traffic was running smoothly.

**(MD)** – How long did you take for your lunch break?
**(AC)** – 20 minutes, I left at 11:38, I was back at 12:04. Maybe under 20 minutes.

**(MD)** – Sergeant Weldon reported that at approximately 12:15 hours, you stated you received a text message from a supervisor advising you to report off, and that there was a bus waiting for you. Who sent you the text message?
**(AC)** – I never said that it was from a supervisor.

**(MD)** – Who sent the message to leave your post?
**(AC)** – Nawuoh said everyone was waiting for me on 33rd waiting for me to come down.

**(MD)** – Did you tell any supervisor you were reporting off?
**(AC)** – I talked to Sergeant Weldon. I made it known to him that I need to leave at 12:30 he said "yeah I know" and that was the end of the conversation.

**(MD)** – On Friday, April 24, 2026, there was an unruly crowd gathered on Shoemaker Green. Is this correct?
**(AC)** – Yes

**(MD)** – Were you present on Shoemaker Green?
**(AC)** – I was

AC
Initial

**(MD)** – What actions did you take while there?

**(AC)** – We were instructed to line up, which I did. Once we lined up, we were instructed to push juveniles and get them to the exit. After that, we were told by the Captain to go to different areas within the field and that if there were other groups of juveniles, to push them out.

**(MD)** – Sergeant Alexander reported that he observed you leaning against a tent pole away from other officers who were actively managing the crowd. Do you recall leaning against a tent pole?

**(AC)** – I do not.

**(MD)** – Did you observe other officers forming a line to contain or manage the crowd? Were you part of that line? If you were not, why not?

**(AC)** – I was part of the line. My body camera was activated during this. I feel that my body camera disputes this statement.

**(MD)** – Did Sergeant Alexander instruct you to join by motioning for you to join the line of officers?

**(AC)** – I don't think I talked to Sergeant Alexander that day at all.

**(MD)** – Sergeant Alexander reported that after motioning for you to join the other officers, he did not see you again. Where did you go?

**(AC)** – The whole statement, we were instructed to line up upon arrival. After we were in the line and the group calm down. The captain directed us to go to separate tents. We were told if juveniles arrived at our tents to direct them to the exit.

**(MD)** – Did you take any actions to assist with the unruly crowd on Shoemaker Green?

**(AC)** – I did, when we were lined up. If we were told to move any juveniles I did that. I don't want to keep going deeper into that statement, so I will end with that.

**(MD)** – Is there anything else you would like to add before this interview concludes?

**(AC)** – No.

AC
Initial

**Interview concluded at 21:38 hours.**

---

#15

Lieutenant Michael R. Dougherty #15

#117

PPA President Christopher Denshuick #117

Police Officer Anthony Corrado #~~117~~ 107

#7

Captain Joseph Fedman #7

# EXHIBIT G

# GRIEVANCE STATEMENT

**Grievant:** Officer Anthony Corrado #107

**Date:** [Insert Date] 05-06-26

**Subject:** Violation of Article VII, Section 2 – Improper Disciplinary Record and Procedural Violations

## Statement of Grievance

The University, including the Police Department, violated Article VII, Section 2 of the Collective Bargaining Agreement, as well as other applicable provisions, by issuing and maintaining a disciplinary memorandum titled "Conclusion; Safety Review Board Hearing; 2026-01" without providing the grievant an opportunity to review the document, receive a copy, and submit written comments prior to its issuance and/or placement into a system of records. Additionally, the Employer improperly extended the grievant's probationary period without contractual basis and failed to notify the Union of a material change to the grievant's employment status.

## Facts

1. On March 3, 2026, a memorandum was issued concluding that Officer Corrado violated departmental policy related to a motor vehicle accident.
2. The memorandum includes findings of fault, policy violations, and imposes consequences, including non-driving status, required training, and impacts to probationary status.
3. The memorandum constitutes a formal disciplinary record, regardless of how it is labeled.
4. The grievant was not provided the opportunity to review the document prior to its finalization, nor given a meaningful opportunity to submit written comments before it was issued.
5. The memorandum was published on March 3, 2026; however, the grievant did not receive the memorandum until April 11, 2026, significantly limiting his ability to respond in a timely manner.
6. The Employer has indicated that the memorandum was not placed in an official personnel file; however, the document is retained, retrievable, and may be relied upon in future employment actions, thereby constituting a system of records under Article VII, Section 2.
7. The memorandum and related actions resulted in an extension of the grievant's probationary period; however, the Union was not notified of this extension.
8. The failure to notify the Union and the delayed delivery of the memorandum deprived the grievant of representation and contractual protections.
9. The grievant was initially issued a memorandum extending his probationary period to April 7, 2026. A subsequent memorandum further extended the probationary period, citing time missed due to Injury on Duty (IOD). The Collective Bargaining Agreement contains no provision permitting the extension of probation based on time missed due to IOD.

## Contract Violation

Article VII, Section 2 states that the University may not insert any informal or formal disciplinary records into a system of records without first allowing the employee to review the document, receive a copy, and submit written comments in response. The Employer failed to comply with these requirements. Additionally, the Employer failed to follow required procedures regarding notification and representation

and imposed an extension of probation without contractual support.

## Argument

The memorandum is disciplinary in nature as it sustains allegations of policy violations, imposes corrective actions, and affects the grievant's employment status, including probation. Labeling the document as something other than discipline or claiming it was not placed in a personnel file does not negate its function as a disciplinary record. If the document is maintained, retrievable, or used in any future decision-making, it qualifies as a record under the Agreement. The delayed delivery of the memorandum and failure to notify the Union further undermine the Employer's position and constitute additional procedural violations. The inconsistent extensions of the grievant's probationary period, particularly where based on Injury on Duty (IOD) leave, are not supported by any provision of the Collective Bargaining Agreement and constitute an additional violation of contractual protections.

## Remedy Requested

- The memorandum be immediately removed from any and all systems of records.
- The memorandum not be used in any future disciplinary or employment-related decisions.
- Any references to the memorandum be expunged.
- The probationary extension be rescinded and the grievant restored to his proper status.
- The grievant be made whole for any impact this memorandum has had on his employment status.
- Any other relief deemed appropriate.

Signature: ______________________

Officer Anthony Corrado #107

# EXHIBIT H

Penn
University of Pennsylvania
Division of Public Safety

University of Pennsylvania Police
4040 Chestnut Street
Philadelphia, PA 19104
Telephone 215 898 7515
Emergencies 215 573 3333
www.publicsafety.upenn.edu

May 8, 2026

Anthony Corrado
318 Delaware Avenue
Claymont, DE 19703

Dear Mr. Corrado,

This letter is to inform you that you are being terminated during your probationary period effective immediately, May 8, 2026. During your probationary period you violated the following article(s) in the UPPD Code of Conduct:

Article I: Rules, Authority, and Responsibilities
1.07 – UPPD personnel shall not commit any act which constitutes a violation of the written directives of the UPPD.

Article II: Conduct Unbecoming
2.21 – Repeated violations of any Departmental rules or regulations.

2.22 – Any incident, conduct or course which indicates that an employee has little or no regard for his/her responsibility as a member of the UPPD.

2.30 – Unsatisfactory performance. Personnel shall maintain sufficient competency to properly perform their duties and objectives of the UPPD.

Article V: Insubordination
5.01 – Refusal to recognize, comply or submit to the authority of a supervisor. Personnel shall be respectful and non–defiant to all UPPD supervisory personnel. This shall include unruly behavior.

5.06 – Refusal to promptly obey proper orders from a superior officer. This will include orders relayed from a supervisor by an employee of the same or lesser rank.

Article VI: Neglect of Duty
6.02 – Failure to properly patrol area of responsibility or loafing.

6.08 – Unauthorized absence from assignment.

6.10 – Failure to comply with any Police Chief's orders, directives, memorandums, or regulations; or any oral or written orders of superiors. This includes committing any act which constitutes a violation of the written directives of the UPPD.

6.20 – Performing any activity on duty which does not relate to the duty assignment.

6.24 – Performing official duties in a negligent, careless or otherwise inattentive manner.

Penn
University of Pennsylvania
Division of Public Safety

University of Pennsylvania Police
4040 Chestnut Street
Philadelphia, PA 19104
Telephone 215 898 7515
Emergencies 215 573 3333
www publicsafety upenn edu

6.28 – Failure to take prompt and appropriate police action toward aiding a fellow officer or citizen. This shall include failure to provide backup to a fellow officer, whether the exposure to possible danger exists or not; the failure to maintain a high spirit of cooperation within the UPPD, the community and with other criminal justice agencies.

6.30 – Failure to follow established UPPD guidelines for meals or breaks. Personnel shall be permitted to suspend patrol or other assigned activity, subject to immediate call at all times, for the purpose of having meals during the tours of duty, but only for such period of time and place as established by UPPD guidelines.

6.31 – Failure to maintain satisfactory performance. All UPPD personnel shall maintain sufficient competency to properly perform their duties. Unsatisfactory performance shall include: poor performance evaluations, a written record of repeated infractions of UPPD guidelines, unwillingness or inability to perform assigned tasks, lack of knowledge of the law, or the failure to conform to work standards established for the employees rank, grade, position or assignment.

6.32 – Failure to remain visible and readily available to the public while on–duty. Personnel shall not conceal themselves, except for an authorized police purpose.

Article VII: Disobedience
7.28 – Leaving Duty Post. Personnel shall not leave their assigned duty posts during a tour of duty except when authorized by proper authority.

All University-issued property must be surrendered immediately upon receipt of this notice, including your department-issued firearm, badge, and all University identification/access cards. Captain Christian VanDerVort (215-778-4997) should be contacted for the return of any additional items that are not currently in the workplace.

You should contact the Penn Benefits Center (1-888-736-6236) to discuss your benefits coverage.

Sincerely,

Derrick E. Wood, MBA
Chief of Police
Penn Police Department
University of Pennsylvania
Division of Public Safety
4040 Chestnut Street
Philadelphia, PA 19104